488 So.2d 346 (1986)
EMAR, INC., Plaintiff-Appellant,
v.
WEBSTER HOMES, INC., et al., Defendants-Appellees.
No. 85-468.
Court of Appeal of Louisiana, Third Circuit.
May 14, 1986.
Kaliste J. Saloom, Lafayette, for plaintiff-appellant.
Voorhies and Assoc., Thomas R. Hightower, Jr., Rodney Bodin, Hurlburt and Privat, David A. Hurlburt, Preis, Kraft, Susan A. Daigle and Walter K. Jamison, III, Onebane and Assoc., James Pate, Lafayette, for defendants-appellees.
Before DOMENGEAUX and YELVERTON, JJ., and JACKSON, J. Pro Tem.[*]
YELVERTON, Judge.
Emar, Inc., owner of a just completed apartment complex, filed suit against the building contractor, Webster Homes, Inc., and its liability insurer, Continental Casualty Company, for damages caused by improper installation and contamination of the electrical services boxes. The suit was based on the provisions of the building contract, and also on negligence. Other defendants named in the suit were two subcontractors, Harry Caulton and Rodney Bodin, d/b/a B & W Electric, and their alleged insurer, Hartford Insurance Company of the Southeast.
The two insurers, Hartford and Continental, filed a motion for summary judgment arguing that the property damage forming the basis of the suit occurred outside the effective periods of insurance coverage *347 provided by their policies. From a judgment granting the defendants' motions for summary judgment, the plaintiff appeals. We reverse.
The single issue presented by the appeal is whether the policy coverages had terminated when the damage occurred.
The summary judgment evidence bearing on this issue consists of the petition, affidavits, and the policies.
The plaintiff's petition sought damages covering the replacement of the contaminated electrical boxes for each of the apartments, as well as the loss of revenue occasioned by the apartment units having been rendered uninhabitable.
The affidavit of Emile Reggie, the President of Emar, Inc., reveals that Emar entered into an agreement with Webster Homes to construct 100 apartment units to be known as Garden Heights Apartments. Webster engaged in the construction of the apartments from May 1982 through the end of construction in December 1982. Webster and its subcontractors did the electrical work including the installation of the electrical service panels. This work was substantially completed before the end of December 1982.
The affidavit of Ed Dauphin, the executive director of Acadiana Metro Code Authority, which apparently maintains and enforces local electrical and construction codes, explains how the damage might have occurred that formed one of the bases of the suit. He said:
"Subsequent to installation of 100 electrical breaker systems in the Garden Heights Apartments, fires broke out in the electrical panels of at least three of the breaker systems. Upon inspection by Metro Code, it was determined that the protective coverings supplied with the breakers by the manufacturer had been removed or displaced allowing contamination by foreign material sprayed during the construction of the apartments and before final installation of all electrical components of the breaker systems. The said contamination voided the U.L. rating of, and the manufacturer's warranty for, the breaker systems' electrical configuration by permanently and irreversibly altering the electrical characteristics of the electrical systems. The said contamination created serious fire and electrical hazard in each of the exposed breaker systems."
Continental's insurance policy was for comprehensive general liability, and it was issued to Webster Homes on May 11, 1982. A notice of cancellation in the record declares that this policy was cancelled on March 15, 1983. The policy provided in pertinent part:
"1. COVERAGE YCONTRACTUAL BODILY INJURY LIABILITY
COVERAGE ZCONTRACTUAL PROPERTY DAMAGE LIABILITY
The company will pay on behalf of the insured all sums which the insured, by reason of contractual liability assumed by him under any written contract designated in the schedule for this insurance, shall become legally obligated to pay as damages because of
Y. bodily injury or
Z. property damage
to which this insurance applies, caused by an occurrence."
Hartford issued a comprehensive general liability insurance policy to Rodney Bodin, d/b/a B & W Electrical Company, on July 21, 1982, and it was cancelled on December 7, 1982. That policy provided in pertinent part:
"1. COVERAGE ABODILY INJURY LIABILITY
COVERAGE BPROPERTY DAMAGE LIABILITY
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage Abodily injury or
Coverage Bproperty damage

to which this insurance applies, caused by an occurrence."
*348 Both the Continental and Hartford policies defined "occurrence" and "property damage" as follows:
"`occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;
* * * * * *
"`property damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period; ..."
Under La.C.C.P. art. 966 summary judgment should be granted only when there is no genuine issue of material fact and when the mover is entitled to judgment as a matter of law.
The defendant-insurers argue that the damages forming the basis of plaintiff's suit occurred during the months of May and June 1983, and that neither policy provided coverage during this period. This is based on the contention that the fires were the "occurrence" under the provisions of the policies. We disagree. We find that the contamination was the "occurrence" under the version of the facts contained in the affidavit of Ed Dauphin, and that a question of fact remains as to when this occurrence took place.
The meaning of "occurrence" in an insurance setting like this was explained in Davis v. Poelman, 319 So.2d 351 (La.1975). There, the owners of a small airplane filed suit against Poelman Aircraft Company and its owner as well as their liability insurer for damages to the plane while in the custody of defendants. Poelman was a compensated depositary. He agreed to keep plaintiff's plane in the hanger. Within 90 days from the date of the agreement, the plane was removed from the hanger and tied down outside on the apron. The plaintiffs were not notified that this was done. In the course of the next year the engine was stolen. Later, the plane suffered severe wind damage. Plaintiffs never learned of the damage until after the destruction of the plane. The trial court rendered judgment against Poelman and his company but rejected plaintiffs' demand against the insurers. The plaintiffs appealed and the appellate court affirmed, finding no evidence which would prove that any damage occurred during the policy period of the American Fire and Casualty Company, the insurer.
The Supreme Court granted writs and determined that the cause of plaintiffs' loss was Poelman's violation of the agreement to store the plane in the hanger, that this violation was an "occurrence" which took place during the policy period, and that the damage occurred to the plane from its unprotected exposure on the apron. The Supreme Court rendered judgment against the insurer, even though the insureds did not become aware of the damage until after the expiration of the policy.
In the present case both insurers are obligated to pay as damages physical injury to property "which occurs during the policy period including the loss of use thereof at any time resulting therefrom..." Under both policies "occurrence" means an accident, including continuous or repeated exposure to conditions which result in property damage. The insurers argue and the trial court found that the "occurrences" were the fires that broke out in May or June 1983 to several of the electrical boxes. However, the affidavit of Ed Dauphin reveals that the contamination of the 100 electrical breaker systems occurred during construction of the apartments, and that the contamination created an electrical hazard in each of the exposed breaker systems necessitating their replacement. The damaged boxes were not limited to those that also suffered fire damage, but extended to all 100 in the system.
We distinguish this case from Oceanonics, Inc. v. Petroleum Distributing Co., 280 So.2d 874 (La.App. 3rd Cir.1973), affirmed *349 292 So.2d 190 (La.1974). There, the boom of a crane broke causing property damage. This happened outside the policy period. The breaking of the boom was traced to a defective weld. The weld had been done during the policy period. The court held that because the damage did not occur until after the policy period, there was not an occurrence during the policy, and there was no coverage. Here, the damage, i.e., the contamination, may have occurred during the policy period. It was the contamination to each of the one hundred boxes that, according to the opinion of one affiant, necessitated the replacement of all of them, not the fires and the damage caused thereby.
Under these facts we find that the trial court erred in finding, summarily, that the fires were the only "occurrence." The alleged contamination would also be an "occurrence" which resulted in continuous and repeated exposure to conditions resulting in property damage. The record does not reveal if the alleged contamination occurred during or outside the policy periods of the coverages. Therefore, the trial court erred in granting summary judgment to the defendant-insurers.
For the above reasons, the judgment of the trial court granting summary judgments in favor of Continental Casualty Company and in favor of Hartford Insurance Company of the Southeast are hereby reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. The insurers will share equally the costs of this appeal.
REVERSED.
NOTES
[*] Judge Robert P. Jackson of the Ninth Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.