653 So.2d 1215 (1995)
Ravel Rubi, Wife of/and John KOROSSY,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp. and ABC Corp., Manufacturer of Siding,
Michael A. SIMPSON and Claudia Simpson,
v.
SUNRISE HOMES, INC., Coast Quality Construction Company,
George E. BRENNER, Jr. and Ronald A. Blanco,
v.
SUNRISE HOMES, INC., Coast Quality Construction Company, Masonite Corp. and Standard Mortgage Corp.,
Kimberly Burge Gabert, Wife of/and Thomas James GABERT,
v.
SUNRISE HOMES, INC. and Homebuilders Warranty Corp., II,
Maria Gifford, Wife of/and Milton L. FOLEY,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., Masonite Corp. and Standard Mortgage Corp.
Michael MUIR and Darlene Muir,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corporation,
Lanny BOWERS,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Marie Trauth, Wife of/and Patrick Lynn, SHANNON,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Jamie Stimpson, Wife of/and Raymond BILNOSKI,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., Howard Pile Driving, Inc. and ABC Insurance Company,
Karen Craig Wife of/and Ray RODRIGUEZ,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Linda K. WHITTAKER,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Company,
Paula Citrano, Wife of/and Ronald K. LANDIS,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Danette Koetitz, Wife of/and Steven GUCCIONE,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Toufic NASSIF,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp. and Shirley Nassif,
Debra Mull, Wife of/and Morris A. NAQUIN, Jr.,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp. and Howard Pile Driving Corp.,
Judy MANNINO, Wife of/and Wade R. BREAUX,
v.
COAST QUALITY CONSTRUCTION CORP., *1216
Darnel Thiel Monteverde, Wife of/and Brian Louis MONTEVERDE,
v.
SUNRISE HOMES, INC.,
Maria G. Kattengell, Wife of/and Gustavo M. KATTENGELL, Jr., Individually and on Behalf of their Minor Children Gustavo M. Kattengell, III and Jacquelyn M. Kattengell,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., Home Buyers Warranty Corp., Standard Mortgage Corp., Federal Housing Authority, Department of Housing Urban Development,
Martin H. RADOSTA, Jr.,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., J.J. Krebs & Sons, Inc. and Howard Pile Driving Corp.,
Gerald G. HEINEMANN
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., J.J. Krebs & Sons, Inc. and Howard Pile Driving Corp.,
Faye Rousseau, Wife of/and Norman Joseph NAQUIN,
v.
SUNRISE HOMES, INC.,
Suzanne Sliman, Wife of/and Raymond Charles SCHAFFER,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., J.J. Krebs & Sons, Inc. and Home Buyers Warranty Corp. #2,
Debra Thokey SMITH,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corp., J.J. Krebs & Sons, Inc. and Howard Pile Driving Corp.,
Alida Simmons BLUNT,
v.
SUNRISE HOMES, INC.,
Jose and Marina BERNARDO,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
David and Yolanda JONES,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Dehart J. BOONE, Jr.,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Floyd J. MAHLER,
v.
SUNRISE HOMES, INC. and Coast Quality Construction Corp.,
Ileana Boudet, Wife of/and Richard CAMPOS,
v.
SUNRISE HOMES, INC.,
Karen McKee, Wife of/and Curtis K. KILPATRICK,
v.
SUNRISE HOMES, INC., Coast Quality Construction Corporation and J.J. Krebs & Sons, Inc.
Nos. 94-CA-473 through 94-CA-502.
Court of Appeal of Louisiana, Fifth Circuit.
March 15, 1995.
Rehearing Denied May 17, 1995.
*1218 John A. Stewart, Jr., J. Ashley Inabnet, New Orleans, for defendants/appellants, Valley Forge Ins. Co. & Continental Cas. Co.
Richard S. Vale, Jeffery W. McDonald, Metairie, for defendant/appellant, Wausau Ins. Companies.
David C. Loeb, Daniel E. Zelenka, II, Jack E. Morris, Metairie, for plaintiffs/appellees-appellants, Sunrise Homes, Inc. & Coast Quality Constr. Corp.
Sally I. Gaden, New Orleans, for defendants/appellants, Louisiana Ins. Guar. Ass'n, as Statutory Obligor for Mission Nat. Ins. Co.
William A. Porteous, III, New Orleans, for defendant/appellant, U.S. Fidelity and Guar. Co.
P. Albert Bienvenu, Jr., Gregory J. Mc-Donald, New Orleans, for defendant/appellant, Scottsdale Ins. Co.
Before DUFRESNE, WICKER and GOTHARD, JJ.
WICKER, Judge.
Before us are 30 related lawsuits which were consolidated for purposes of this appeal. The plaintiffs are owners of homes in the Woodmere and Woodmere South Subdivisions in Harvey, Louisiana, whose homes were damaged by excessive differential settlement of the foundations. They sued the subdivision developer (Coast Quality Construction Corporation) and the marketer (Sunrise Homes, Inc.) in redhibition, alleging *1219 the excessive settlement resulted from faulty construction and defective building materials.
The case has not yet gone to trial on the merits of the main demand. The issue on this appeal is whether Coast and Sunrise (hereinafter collectively called "Coast") had insurance coverage for the allegations made by the plaintiffs.[1] Coast's insurers denied coverage and all but one refused to provide a defense.[2]
Coast filed a petition for declaratory judgment in each of the cases, seeking determination of the defense and coverage questions. The district court ruled in favor of Coast and against the insurers, finding that the insurance policies provide coverage, that the exclusions raised by the insurers are not applicable, that the date of sale of each home determines which policies provide coverage, and that the insurers have a duty to defend in cases in which the date of sale was within one of the applicable policy periods. The court found no coverage in three cases in which the date of sale was not within any of the applicable coverage periods.
All the insurers have appealed, cross-appealed, or answered the appeal. Coast has answered the appeals and has cross-appealed.

FACTS
For purposes of the declaratory judgment action, Coast and the insurers entered into stipulations in each case, which were alike in each case except for particulars regarding the individual plaintiffs. To set out the facts we reproduce relevant portions of the form stipulations:
1. Coast is in the business of real estate development. As it relates to the instant litigation, that business involves the acquisition of undeveloped land, subdividing that land into single family subdivisions, the construction of single family homes, and the sale of those homes to the homeowners.
2. Woodmere South Subdivision was developed by Coast and contains approximately 1000 homes. Coast acted as the developer/general contractor for almost all of these homes, including the plaintiff's home. Coast completed the home purchased by the plaintiff on or about [date].
3. Plaintiff in main demand purchased a single family home from Coast on [date].
4. Plaintiff in the main demand filed a petition on [date] against Coast Quality Construction Corp. and/or Sunrise Homes, Inc. alleging that the home has suffered differential settlement of its foundation and that said settlement is a defect in the home constituting a redhibitory vice.
5. Plaintiff has alleged that Coast is the manufacturer of the home within the meaning of Civil Code articles 2520, et seq., and particularly C.C. article 2545.
6. The plaintiff alleges that the differential settlement was first discovered on [date].
7. The home [has/has not] been repaired.
8. Coast purchased the following CGL policies with broad form property damage endorsements:

Insurer Policy number Effective dates
Wausau XXXXXXXXXXXX 7/1/83-5/5/85
USF & G MP022754260 5/5/85-5/5/86
Valley Forge XXXXXXXXX 5/5/86-5/5/87

9. Coast purchased the following umbrella liability insurance policies:

Insurer Policy number Effective dates
Mission MN024174 7/1/83-7/1/84
Mission MN039567 7/1/84-7/1/85
Scottsdale UMB005575 7/1/85-7/1/86
Continental UMB100216470 7/1/86-5/5/87

10. Coast and Sunrise Homes, Inc. are both named insured under the insurance policies. On December 5, 1986, Sunrise was merged into Coast, which now uses Sunrise Homes as a tradename. Prior to December 5, 1986, *1220 Coast acted as the developer of the plaintiff's home and Sunrise acted as marketer of the home.
11. Coast has made a claim with its insurance carriers for coverage arising out of the construction and sale of the home, and for a defense of said claim.
12. All insurers described in Stipulations 8 and 9 have denied coverage, and only Wausau has provided a defense, but then under a reservation of rights.
13. The following functions were performed by the subcontractors and engineers on behalf of Coast and on the date indicated:
[Table, not reproduced here, lists subcontractors who performed soil testing, slab design, pile driving, steel installation, concrete pouring and finishing, and pile testing.]
14. Coast does not occupy, rent or hold for rental the single family homes which it develops.
15. Coast has not withdrawn any of the homes it has developed from the market.
16. Coast neither expected nor intended the homes which it developed to experience differential settlement.
Lawrence W. Gilbert, president of Gore Engineering and an expert in the field of soil engineering, testified that Gore Engineering was hired by Coast in the early to mid-1980's to examine homes that had undergone excessive differential settlement and to determine what could be done to restore them.[3] He said engineers commonly expect varying degrees of differential settlement to occur in most structures, but the amount of differential settlement they measured in these cases was excessive. Gilbert stated that builders in the New Orleans area commonly use a pile support structure to control settlement by taking the load off the structure and transferring it to deeper, more competent soil strata. He attributed the excessive settlement in these cases to down-drag load on the pilings by the fill material added to the lots; lower ground water table due to a drainage canal and other factors; inadequate or defective pilings; and errors in placement of the pilings under the slabs.
Gilbert stated that the settlement process begins when the slab is connected to the piles undergoing settlement during building of the structure. However, the settlement might not be perceptible until some time later, possibly years later, based on the rigidity of the foundation and also on the individual homeowner's perception of the degree of the problem. In his opinion, had the foundations of these homes been properly constructed the excessive differential settlement would not have occurred.
Lawrence A. Kornman, president of Coast Quality Construction Company, testified that Coast has been developing the Woodmere subdivisions since approximately 1972 and sold the last homes in 1991. There are a total of 3,200 homes in the subdivisions. Kornman described Coast's development methods for the subdivisions as follows: Coast contracts with subcontractors to put in streets, utilities, and drainage. Thereafter the lots are filled so that they will drain into the street. Six to eight months later soil tests and piling tests are performed so an engineer can set a bench mark for the elevation at which to build the home. Coast places stakes in the ground to show where piles are to be driven; then construction begins.
Kornman stated that Coast's supervisors coordinate scheduling of the subcontractors and they inspect for quality control, but they do not supervise or control the means and methods of construction used by subcontractors. Coast did not perform any of the work in the Woodmeres with its own employees, but only sold completed homes. Coast did not enter into any contracts to build for buyers. Kornman testified that Coast received the first complaint of excessive settlement in 1985. The differential settlement complaints were treated as warranty items. By April 1986, Coast had arranged for shoring *1221 work on three houses. At that time, stated Kornman, the problem would have been considered an aberration.
Our review of the record establishes that 50 of the 1,000 homes built at the south end of the Woodmere development (or five percent) underwent excessive differential settlement. Thirty of those homes are involved in this litigation. Of those 30 homes, two were completed in 1982, one in 1983, ten in 1984, ten in 1985, six in 1986, and one in 1987. The lapse of time between the completion of construction and the discovery of damage in most cases was two to three years, but varied from as little as two weeks to as much as six years.

ISSUES
The gist of the insurers' arguments is that comprehensive general liability policies are not intended to substitute for contractors' performance bonds and, therefore, the definitions and exclusions in the policies negate coverage for damages arising out of defective construction. Coast's argument, in essence, is that the damages alleged in the main demands are damage resulting from occurrences as defined in the policies and that the policy exclusions do not apply, so that there is coverage for any liability arising out of the abnormal differential settlement.
As noted in the stipulations, the primary policies were provided by Wausau Insurance Companies (7/1/83-5/5/85), United States Fidelity and Guaranty Company (USF & G) (5/5/85-5/5/86), and Valley Forge Insurance Company (5/5/86-5/5/87). The excess policies were provided by Mission National Insurance Company (7/1/83-7/1/84 and 7/1/84-7/1/85), Scottsdale Insurance Company (7/1/85-7/1/86), and Continental Casualty Company (7/1/86-7/1/87).[4]
The primary policies are standard Comprehensive General Liability (CGL) policies which include Broad Form Property Damage (BFPD) endorsements and Completed Operations coverage. All three primary policies employ standard-form language. The Mission and Continental umbrella policies are following-form policiesi.e., except in some specific situations they "follow the form" of the primary policies and provide the same type of coverage. The Scottsdale policy is not a following-form policy and differs in some respects from the others.
The insuring agreements of the primary policies provide: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this insurance applies, caused by an occurrence[.]" Occurrence is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Property damage is defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."[5]

1. Valley Forge and Continental Casualty
Valley Forge and Continental Casualty have appealed in all 30 cases, although they were specifically named as the insurers with the applicable coverage period in only two cases. Valley Forge's primary policy ran from May 5, 1986 to May 5, 1987. Continental's excess liability policy ran from July 1, 1986 to May 5, 1987.
They make the following arguments: (1) Their policies provide no coverage because Coast had actual or constructive knowledge of the loss/risk prior to the policy period, in that it knew or reasonably should have anticipated such damage would occur. (2) Alternatively, there was no occurrence because the policy definition requires that the insured neither expected nor intended the damage. (3) There was no property damage as defined *1222 by the policy because the settlement resulted from defective workmanship; defective work is not property damage under Louisiana law. (4) Coverage is excluded under the alienated premises exclusion, the products exclusion, and the work exclusion. (5) If coverage is found, the property damage occurred when the homes were constructed and that date should be the trigger of coverage. (6) They have no duty to defend Coast because there is no coverage or, at most, they have a duty to defend only in cases in which the damage occurred during their policy periods.

2. USF & G
USF & G's primary policy was in effect from May 5, 1985 to May 5, 1986. It was cast in judgment in 13 cases and has appealed only those judgments. USF & G makes the following arguments: (1) Coast has no coverage under its policy because the property damage resulted from defective construction. (2) Alternatively, there was no occurrence resulting in property damage during the policy period because the policy definitions of those terms apply to all coverages and preclude coverage of nearly all the claims in this case. (3) A sale does not constitute an occurrence as defined in policy, because it is neither an accident nor repeated exposure to conditions. (4) Claims for property damage that became manifest during the policy period are foreclosed by the exclusions for alienation of premises, loss of use, and product/work product. (5) In all the cases where damages became manifest following the expiration of the USF & G policy, any mental anguish claims occurred outside the policy period and are, therefore, not covered by USF & G.

3. Scottsdale
Scottsdale's excess policy, which ran from July 1, 1985 to July 1, 1986, provided excess coverage during the most of the same policy period as USF & G, as well as for part of Valley Forge's policy period. Scottsdale was cast in judgment in 11 of the cases; it has appealed in those 11 and also in 17 others. Scottsdale argues: (1) There is no coverage because there was no occurrence: the act of sale was not an occurrence under the policy, because it was neither property damage nor personal injury as defined in the policy. (2) Deficient product or deficient work performed is not an occurrence; a CGL policy is not intended to substitute for a performance bond. (3) Coverage is negated by the exclusions for products or work performed by the insured, for loss of use, for defective products, work, or property exclusion, and for property in the care, custody and control of the insured. (4) Alternatively, the timing of coverage should be based upon the manifestation of physical injury. (5) The judgment taxing costs against Scottsdale in the Boone case (No. 94-CA-499) is an abuse of discretion, because Mission was the excess insurer found to provide coverage.

4. Wausau
Wausau provided the primary policy from July 1, 1983 to May 5, 1985. It was cast in judgment in 12 of the cases, but has appealed in 28 cases. In contrast to most of the other insurers, Wausau does not raise the policy exclusions, but simply argues there is no coverage because the occurrence took place after termination of the policy period. Wausau contends the occurrence in each case was the date of discovery of the damage, not the date of sale. Only one homeowner discovered damage during Wausau's policy period; therefore, Wausau asserts its policy provided no coverage in the other cases.
5. LIGA (Mission National)
LIGA is successor to Mission National, which provided umbrella liability policies from July 1, 1983 to July 1, 1984 and from July 1, 1984 to July 1, 1985. Mission's policy was excess to the Wausau policy from July 1, 1983 to May 5, 1985 and excess to the USF & G policy from May 5, 1985 to July 1, 1985.[6] Mission was cast in judgment in 13 cases and LIGA has appealed those judgments.
LIGA contends: (1) The allegations do not constitute "occurrences" as defined in the *1223 Mission policies. (2) The work product exclusions in the Mission policies exclude coverage. (3) The endorsements in the Mission policies exclude coverage for structural injury to the foundations of the plaintiffs' homes and for any work performed by or on behalf of its insured. (4) LIGA has no duty to defend Coast. (5) The trigger-of-coverage date was not the date of sale of each home. (6) The court erred in casting Mission rather than LIGA in judgment.
6. Sunrise/Coast
Coast answered the appeals and cross-appealed to protect its interests. It makes the following arguments: (1) The policies' definition of property damage encompasses any physical injury to tangible property which occurs during the policy period and the definition of occurrence encompasses any continuous exposure to conditions which results in property damage. (2) The property damage here was caused by the continuous exposure of each home's foundation to conditions brought about by any number of factors acting in concert. (3) The parties have stipulated that Coast at no time expected or intended the homes it developed to experience abnormal differential settlement. (4) The parties clearly intended for the policies to provide completed operations coverage for "liability arising out of work performed by subcontractors on immovable property never occupied, rented, or held for rental by the insured," such as the property here. (5) The exclusions raised by the insurers do not apply. (6) Because the differential settlement arose from continuous exposure to conditions which existed at the time of the act of sale, the sale date is the appropriate trigger date for coverage. (7) The insurers have a duty to defend because the underlying policies obligate the primary insurers to defend where a suit seeks damages for property damage caused by an occurrence. The excess insurers are obligated to defend any suit once the policy limits of the underlying policies have been exhausted. The allegations in the plaintiffs' suits have alleged property damage within the meaning of the policies' definition of that term, and a liberal interpretation of the allegations suggests the abnormal differential settlement was caused by an occurrence as broadly defined in the policies.

LAW AND ANALYSIS
Known Risk Doctrine
Initially, Valley Forge and Continental Casualty contend there is no coverage under their policies because Coast had actual or constructive knowledge there was a substantial probability of excessive differential settlement claims, prior to the Valley Forge policy's effective date. They contend the knowledge made such losses a known risk, not an accident, so that coverage is precluded.
The cases cited by Valley Forge and Continental Casualty on the known risk doctrine are from other jurisdictions.[7] Those cases state that the known risk doctrine is applicable if the insured knew or reasonably should have known there was a substantial probability of a loss before the policy period began. We find no Louisiana cases which have employed it. Regardless of any Louisiana precedent, however, we conclude it is inapplicable in this case. The parties stipulated that "Coast neither expected nor intended the homes which it developed to experience differential settlement." That stipulation by itself negates knowledge of any "substantial probability."
Further, at the inception of the Valley Forge policy Coast had no reason to believe the complaints made to that date were more than anomalies. Valley Forge and Continental Casualty argue, "[W]hat Coast intended at the time it built each home is not the issue.... The issue is Coast's actual or constructive knowledge of differential settlement prior to the Valley Forge policy period." By May 5, 1986, there had been *1224 seven complaints of differential settlement. Four of those homes are adjacent to one another and bounded by a canal in the rear. A subsoil investigation report on one of the homes had indicated the proximity of the home to the canal was the significant factor. Coast reasonably believed the complaints regarding the other three homes to be unrelated to differential settlement. We conclude the appellants failed to prove that the insured should have known of a substantial probability of losses when Valley Forge's policy was issued.
"Occurrence" and Property Damage
The next issue is whether the trial court erred in its implicit finding that the damage in these cases was property damage caused by an occurrence, as defined in the policies, and in finding that the date of sale of each house was the trigger of coverage.
The insuring agreements of the primary policies state:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence....
The policies define "occurrence" and "property damage" as follows:
"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured....
"[P]roperty damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period....
Our threshold determination must be whether the subsidence damage is an "occurrence" for purposes of these policies.
In Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190 (La.1974), the insured was a welding contractor who performed a defective weld on a crane boom during the policy period. After the policy expired, the weld failed and the boom collapsed. The court applied the language of the policy's "occurrence" definition ("an accident `which results, during the policy period, in bodily injury or property damage'") and concluded public policy does not prohibit an insurer from exclusion of coverage for damage accidentally occurring after the policy expiration but resulting from a delictual act committed during the policy period. The supreme court adopted the court of appeal's opinion, which held there was no coverage because the damage manifested itself after the policy expired. Oceanonics, Inc. v. Petroleum Distributing Co., 280 So.2d 874 (La. App. 3rd Cir.1973).
In Serigne v. Wildey, 612 So.2d 155 (La. App. 5th Cir.1992), this Court construed substantially the same definition of "occurrence" to find the collapse of a concrete marina structure into a bayou was covered under the contractor's commercial general liability policy. The evidence indicated the structure's collapse resulted from faulty construction and defective workmanship, including erroneous placement of landfill, improper construction of the tie-back system, insufficient securement of the pilings, and failure to consider tidal fluctuations. Quoting a broad definition of "accident" from Black's Law Dictionary, we concluded, "[T]he marina's fall into the bayou was clearly an accident, and consequently an insured-against occurrence." Id. at 157.
In a recent opinion we found a similar definition of "occurrence" in a CGL policy was ambiguous. Western World v. Paradise Pools & Spas, 93-723 (La.App. 5th Cir. 2/23/94) 633 So.2d 790, involved claims for damage to a swimming pool by cracks which developed in the pool walls and the patio decking surrounding it. We concluded "occurrence" was ambiguous because it was defined as "an accident, including continuous or repeated exposure to conditions" and thus could be construed to include development of cracks in the swimming pool, so that the policy in that case covered the damages.
In Alberti v. WELCO Mfg. of Texas, 560 So.2d 964 (La.App. 4th Cir.1990), sheetrock *1225 walls in a home became discolored due to a chemical reaction. The chemical reaction began during the policy period but did not result in the discoloration until after the policy expired. The fourth circuit concluded:
[C]ommon sense dictates that the "occurrence" defined in the policy ... is the event which caused the property damage itself. In other words, even if a chemical reaction occurred immediately after the placement of the sheetrock mud, it is only when this reaction affected the wall that damage envisioned in the policy occurred. There is no evidence that the wall discoloration occurred before late December, after the policy had lapsed. * * *
See also, Jackson v. Welco Mfg. of Texas, 612 So.2d 743 (La.App. 4th Cir.1992).
The evidence in this case establishes that the damage in these cases was caused by "continuous or repeated exposure to conditions," specifically the factors which Dr. Gilbert testified produced the excessive differential settlement. The policy definition makes "continuous or repeated exposure to conditions" an "accident" for purposes of an "occurrence."
We acknowledge the line of cases which hold that improper or faulty construction does not constitute the accident or fortuitous event that is required in order for there to be an occurrence under the policy definition. See, e.g., Swarts v. Woodlawn, Inc., 610 So.2d 888 (La.App. 1st Cir.1992); Fredeman Shipyard, Inc. v. Weldon Miller Contractors, Inc., 497 So.2d 370 (La.App. 3rd Cir.1986); Bacon v. Diamond Motors, Inc., 424 So.2d 1155 (La.App. 1st Cir.1982); Vitenas v. Centanni, 381 So.2d 531 (La.App. 4th Cir.1980). As we noted in Serigne v. Wildey, supra, however, those cases are distinguishable because of specific policy language in each case. See 612 So.2d at 157.
Similarly, we distinguish Castigliola v. Dept. of Community Development, 538 So.2d 1139 (La.App. 5th Cir.1989), which did not discuss the word "occurrence." Further, the definition of occurrence in this case does not exclude damages caused by improper Construction or defective workmanship, although coverage for such may be obviated by the exclusions discussed infra.
Trigger Date for Coverage
The trial court ruled that the date of sale of each home would determine which insurance policies provided coverage. That ruling in effect made a sale an occurrence under the policy.[8] All the insurers contend the trial court erred in using the date of sale to trigger coverage.
Coast argued, and evidently the trial court agreed, that the date of sale was appropriate to trigger coverage because it is difficult to determine exactly when the damage occurred. Because these are redhibition cases, in which the homeowners must prove the defects existed at the time of sale, and the evidence establishes the defects arose from construction of the homes' foundations, Coast suggested the date of sale as the appropriate coverage trigger. Coast relied on a case from this court, Rodriguez v. Sunrise Homes, Inc., 532 So.2d 952 (La.App. 5th Cir.1988), in which we concluded the cause of action arose when the building was constructed with a latent defect.
We distinguish that case, however, because it dealt not with insurance coverage but with when a cause of action for a warranty claim arose for purposes of the New Home Warranty Act, La.R.S. 9:3141-3150. It does not apply to the insurance policies before us.
We agree with the insurers. A sale does not fit the policy definitions of property damage or occurrence. Therefore, it cannot be used as the trigger of coverage. Rather, we must determine whether the property damage that resulted from the differential settlement occurred during any of the applicable policy periods.
The insurers have posited two alternative theories of when the damage arose the exposure theory and the manifestation theory.
Under the exposure theory, which is urged by Valley Forge and Continental, the damage *1226 would be considered to have occurred when the act which resulted in damage took place, not when the damage was discovered. Thus, where damage develops over a period of time from continuous or repeated exposure to injurious conditions, courts have determined the occurrence took place either at the inception of the exposure period [9] or continuously during the entire course of exposure, as in asbestosis cases[10]. Even where the damage or injury was not manifested until after an insurer's policy period, if that insurer's policy period fell either at the inception or during the course of the exposure, the insurer could be held liable.
Valley Forge and Continental urge us to adopt this theory, relying on the Davis v. Poelman and Emar cases (supra, n. 9), to decide that the damage occurred when the homes were constructed.[11]
Wausau, USF & G, LIGA and Scottsdale, however, urge us to adopt the manifestation theory. Under that theory, property damage would be considered to have occurred when it became manifest, regardless of when the act from which it resulted occurred. That is the theory employed in Oceanonics, Inc. v. Petroleum Distributing Co., supra, as well as in numerous other cases.[12]
We find the manifestation theory should be applied in this case. The differential settlement resulted from each home's continuous or repeated exposure to the injurious conditions over a course of time, but the effects of the excessive settlement did not become "damage" until it was discovered by the homeowners.
It is true that what constituted "damage" depended to an extent on the perceptions of the individual homeowner, in that one may have perceived damage where another perceived only normal wear-and-tear, up to the point where any reasonable person would perceive "damage." Nevertheless, we conclude the better rule is to deem the occurrence took place when the damage was discovered. The policy definition requires an occurrence to "result" in property damage. Under the facts of these cases, property damage did not result until the damage manifested itself.
Accordingly, we find that the claims in these lawsuits are for occurrences resulting in property damage for purposes of these policies, and that the damage resulted on the date when each homeowner discovered it.[13]
Exclusions
Even if we find there has been an occurrence of property damage which would otherwise trigger coverage, all the insurers except Wausau have raised various exclusions in their policies which they contend bar coverage. These include exclusions for damages arising out of the insured's work or products, for alienation of premises, and other miscellaneous exclusions.
The law is well settled that any doubt or ambiguity in an insurance policy must be construed in favor of the insured and against the insurer, and when the ambiguity relates to an exclusionary clause, the *1227 law requires that the contract be interpreted liberally in favor of coverage. Borden v. Howard Trucking Co., Inc., 454 So.2d 1081, 1089 (La.1983). A provision which seeks to narrow the insurer's obligation is strictly construed against the insurer and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. Reynolds v. Select Properties, Ltd., 93-1180 (La. 4/11/94) 634 So.2d 1180, 1183. However, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. Reynolds, supra; Oceanonics, supra.

1. Work Exclusion
The Work Exclusion, raised by USF & G, Valley Forge, Scottsdale, LIGA and Continental, states the insurance does not apply:
(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith[.] [Emphasis added.]
The work exclusion was replaced, however, by the provisions of Section VI(A)(3) of the Broad Form Property Damage Liability Coverage (BFPD) endorsement, which states:
VI. BROAD FORM PROPERTY DAMAGE LIABILITY COVERAGE (Including Completed Operations)
The insurance for property damage liability applies, subject to the following additional provisions:
(A) Exclusions (k) and (o) are replaced by the following:
[This insurance does not apply:]
* * * * * *
(2) except with respect to liability under a written sidetrack agreement or the use of elevators
* * * * * *
(d) to that particular part of any property, not on premises owned by or rented to the insured,
* * * * * *
(ii) out of which any property damage arises, or
(iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;
(3) with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith. [Emphasis added.]
The Broad Form Property Damage endorsements include coverage for "completed operations hazards," which is defined as:
"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,
(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect *1228 or deficiency, but which are otherwise complete, shall be deemed completed.
Thus, Section VI(A)(3) of the BFPD endorsement deletes the phrase "or on behalf of" the named insured and applies only to work performed "by the named insured." As we explained in Rivnor Properties v. Herbert O'Donnel, Inc., 92-1103 (La.App. 5th Cir. 1/12/94), 633 So.2d 735, 751, writ denied, 643 So.2d 147, "The effect of the broad form coverage endorsement, which deletes the words `or on behalf of the insured' in the exclusion provisions, is to provide coverage to the insured for liability arising out of work performed by others on the insured's behalf." Accordingly, work performed by subcontractors for Coast is not excluded from coverage of the policies which contain the BFPD endorsement.
Although none of the umbrella policies include a BFPD endorsement, each incorporates by reference the underlying policy's terms (Continental, Mission) or excepts work performed from exclusion if such coverage is provided by the underlying policy (Scottsdale). Therefore, this exception to the work exclusion applies to all the insurers noted above. Although coverage is excluded for work performed by Coast, it is not excluded for work performed by others on behalf of Coast.
2. Alienation of Premises Exclusion
The Alienated Premises Exclusion, raised by USF & G, Valley Forge and Continental, states:
This insurance does not apply:
* * * * * *
(1) to property damage to premises alienated by the named insured arising out of such premises or any part thereof[.]
The insurers contend this is clear and unambiguous and, since it has been stipulated that Coast built and sold each of the plaintiffs' homes, there can be coverage for none of the claims because each premises was alienated by the insured.
Coast argues, however, that the clause conflicts with the BFPD endorsement and thus produces ambiguity, which should be interpreted in the insured's favor. Coast contends the broadened coverage for work performed by others on the insured's behalf imposed by the BFPD endorsement section VI(A)(3) applies only to the completed operations hazard, so that sale of a property by a developer after completion of the work is a condition precedent to the broadened completed operations coverage. Coast suggests that interpreting the alienation clause to trigger exclusion of the same broadened completed operations coverage would render section VI(A)(3) of the BFPD endorsement ineffective.
We find no Louisiana cases that have interpreted the alienated premises exclusion.[14] Under established principles for interpretation of insurance policies, however, we find no ambiguity in the wording. Nor did the BFPD endorsement broaden or modify the applicability of the alienated premises exclusion.
Accordingly, we find the alienated premises exclusion applies to preclude coverage by USF & G, Valley Forge and Continental.

3. Products Exclusion
The products exclusion, raised by USF & G, LIGA, Scottsdale, Valley Forge and Continental, states:
This insurance does not apply:
* * * * * *
(n) to property damage to the named insured's products arising out of such products or any part of such products[.]
Like the alienated premises exclusion, this exclusion was not replaced or modified by the BFPD endorsement. This exclusion has been said to reflect the intent of the insurance industry avoid possible use of CGL coverage to repair and/or replace an insured's *1229 defective products. See McKenzie and Johnson, Louisiana Civil Law Treatise, Vol. 15: Insurance Law and Practice, § 198 (1986).
The question in this case is whether a home which Coast built and sold is its product. The policy definition states that "named insured's products" means "goods or products manufactured, sold handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle)." The insurers point out that in response to requests for admission in some of the cases in this consolidated lawsuit, Coast admitted it was the manufacturer of the houses it constructed.
Valley Forge and Continental assert the key factor is the distinction between a developer and a traditional general contractor; a traditional general contractor enters into a "services" contract to build a thing, while a developer enters into a contract to sell the end result of an entire process. A contractor usually decides who will perform the various subcontracts, but has little control over the location, design or ultimate owner of the home. A developer, on the other hand, not only purchases and subdivides raw land, installs streets and utilities, fills the land, designs the homes, builds the homes with its own and subcontracted work force, but also sells the completed homes to qualified buyers. A developer exercises a great deal more control and broad responsibility over the production process and the homes are the end result.
This exclusion has been applied previously by courts of this state in cases involving construction or repair of homes. See, e.g., Swarts v. Woodlawn, Inc., 610 So.2d 888 (La.App. 1st Cir.1992); Allen v. Lawton & Moore Builders, Inc., 535 So.2d 779 (La.App. 2nd Cir.1988); Vobill Homes, Inc. v. Hartford Acc. and Indem. Co., 179 So.2d 496 (La.App. 3rd Cir.1965), writ denied, 248 La. 698, 181 So.2d 398 (La.1966). In such cases the courts have treated the home, either explicitly or implicitly, as the product of the builder and have held the product exclusion bars coverage. In doing so they often have stated that a CGL policy is not intended to be a substitute for a performance bond by a contractor. See Castigliola v. Dept. of Community Development, supra, at 1141.
Coast, however, argues that "products" as used here does not apply to immovables and, further, that the cases on which the insurers rely did not deal with policies containing a BFPD endorsement with completed operations coverage. Coast contends the products exclusion cannot be construed separately from the narrowed work exclusion set out in the BFPD endorsement.
As stated previously in this opinion, the BFPD work exclusion excludes only work performed by the insured, but permits coverage for work performed by contractors on behalf of the insured. The products exclusion, however, as construed by the insurers, conflicts with that narrowed provision, since their construction would make the total home, including portions produced by contractors, excluded from coverage. Under the principles of interpretation of insurance exclusions, that creates an ambiguity which must be interpreted in favor of the insured. Borden v. Howard Trucking Co., Inc., supra.
Accordingly, the products exclusion cannot be used to exclude coverage for work performed by others on behalf of the insured.[15]

4. Structural Injury Exclusion
The Mission policies contain a Contractors Limitation Endorsement which states, in section (C)(2), that the policy shall not apply to injury to or destruction of any property arising out of:
[t]he collapse of or structural injury to any building or structure due ... to excavation, including burrowing, filling, or backfilling in connection therewith, or to tunnelling, pile driving, coffer dam work or caisson work....
LIGA contends the damages alleged fall squarely within this structural injury exclusion because the differential settlement was *1230 caused by a combination of downdrag load on the pilings, lowering of the water table of the adjacent canal, and improper installation of the pilings.
We agree that this exclusion fits the evidence in this case. Accordingly, coverage is excluded under Mission's policies.
5. Professional Services Exclusion
Similarly, LIGA argues that Mission's Contractor's Limitation Endorsement excludes coverage for professional services. Specifically, the endorsement states:
It is further agreed that this policy does not apply to any liability for personal injury or property damage arising out of:
* * * * * *
(2) any professional service performed by or on behalf of the insured, including the preparation or approval of maps, plans, opinions, reports, surveys, designs, or specifications, and any supervisory, inspection or engineering services.
We note, however, that the district court judgments state the parties stipulated the issue of exclusion from coverage for damages due to professional acts would be referred to the trial of the main demands. Accordingly, we deem it inappropriate to address this exclusion on this appeal and we pretermit this issue.
6. Loss of Use, Withdrawal from the Market, and Care/Custody/Control Exclusions
USF & G and Scottsdale raise a loss of use exclusion; Scottsdale asserts, in addition, exclusions for withdrawal of products from the market and for damage to property in the care, custody and control of the insured. Valley Forge and Continental have adopted these arguments by reference.
The loss of use exclusion provides that the insurance does not apply "to loss of use of tangible property which has not been physically injured or destroyed." Because the plaintiffs in the main demands assert their homes have suffered physical injury as a result of the excessive differential settlement, the loss of use exclusion by its own terms cannot apply.
The exclusion for products withdrawn from the market applies only where property is "withdrawn from the market or from use because of any known or suspected defect or deficiency," and applies only to "damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the property." Here the plaintiffs in the main demands have alleged property damage to their homes but none has alleged his or her home has been withdrawn from the market or from use. Accordingly, this exclusion does not apply.
The care, custody and control exclusion states that the policy does not apply:
1. to any liability for PROPERTY DAMAGE to property leased or rented to, used by, or in the care, custody or control of the INSURED or as to which the INSURED is for any purpose exercising physical control[.]
Given our conclusion that the trigger of coverage is the date of discovery of damages, the exclusion is inapplicable because by that time the homes were no longer in the insured's care, custody or control.

Duty to Defend
Our supreme court's definitive statement on duty to defend is American Home Assurance Company v. Czarniecki, 230 So.2d 253, 259 (La.1969):
[T]he insurer's duty to defend suits brought against its insured is determined by the allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. * * *
Thus, if, assuming all the allegations of the petition to be true, there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit. Additionally, the allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured. * * *
*1231 Given our determination of the coverage issues on this appeal and our findings regarding the applicability of the exclusions, we conclude the insurers have no duty to defend Coast in these lawsuits. The exception is Wausau, whose policy provided coverage for the damage alleged in the Simpson case (No. 94-CA-474 on our docket, No. 331-638 on the district court's docket) because of the stipulated date the damage was discovered. Since Wausau did not raise any of the exclusions on appeal, Wausau is obligated to provide Coast a defense in that case.

DECREE
For the foregoing reasons, the judgments of the district court are affirmed in part and reversed in part. Judgment hereby is rendered as follows:
1. The property damage alleged by the plaintiffs is within the coverage of the insuring agreements of the policies.
2. The date of discovery of the damage, as stipulated by the parties, determines which insurance policies provide coverage for the plaintiffs' claims in the main demands.
3. The known risk doctrine is not applicable.
4. With respect to all the insurers except Wausau, the exclusion for work performed on behalf of the named insured is not applicable and the exclusion for work performed by the named insured is applicable. With respect to Wausau, the ruling of the district court is upheld and the exclusion is not applicable in either respect.
5. The exclusion for alienated premises is applicable to the claims against USF & G, Valley Forge and Continental Casualty Company.
6. The products exclusion does not apply to exclude coverage for work performed by others on behalf of the named insured.
7. As to Mission/LIGA, the structural injury exclusion is applicable.
8. The exclusions for loss of use, withdrawal of products from the market, and care/custody/control are not applicable.
9. None of the insurers has a duty to defend except Wausau, which has a duty to defend Coast and Sunrise only in No. 94-CA-474, Simpson v. Sunrise Homes (24th J.D.C. No. 331-638).
These cases are remanded to the district court, which is ordered to recast each of the declaratory judgments to reflect the views expressed herein. Each party is to pay its own costs for this appeal.
AFFIRMED IN PART, REVERSED IN PART, RENDERED AND REMANDED.
NOTES
[1] Sunrise Homes merged with Coast Quality Construction in 1986. Since then Sunrise Homes has been used as a tradename only. Coast is the real party in interest before us.
[2] Wausau Insurance Companies provided a defense under a reservation of rights.
[3] He defined "differential settlement" as "a measure of the amount of vertical movement from point to point along a residential slab foundation."
[4] Mission's obligations have been assumed by the Louisiana Insurance Guaranty Association (LIGA), which appears in this litigation as Mission's successor.
[5] The language quoted here is from the Wausau policy. The language in the other policies is substantially the same on the pertinent points.
[6] LIGA states in its brief that the Mission policy was excess to the Valley Forge policy, but that is an error. Their policy periods do not coincide.
[7] Inland Waters Pollution Control v. National Union, 783 F.Supp. 325 (E.D.Mich.1992); New Castle County v. Hartford Acc. & Indem. Co., 933 F.2d 1162 (3d Cir.1991); Eichelkraut & Sons v. Bituminous Cas., 166 Ill.App.3d 550, 117 Ill.Dec. 13, 519 N.E.2d 1180 (1st Dist.1988); Bay State Ins. Co. v. Wilson, 96 Ill.2d 487, 71 Ill.Dec. 726, 451 N.E.2d 880 (1983); USF & G v. Bonitz Insulation Co., 424 So.2d 569 (Ala.1982).
[8] Using the sale date as the trigger of coverage resulted in the insurers being cast in the declaratory judgment as follows: Wausau, 11 cases; USF & G, 14 cases; Valley Forge, 2 cases; Mission (LIGA), 13 cases; Scottsdale, 10 cases; Continental, 2 cases.
[9] See, e.g., Davis v. Poelman, 319 So.2d 351 (La. 1975); Emar v. Webster Homes, Inc., 488 So.2d 346 (La.App. 3rd Cir.1986).
[10] See, e.g., Cole v. Celotex Corp., 599 So.2d 1058 (La.1992); Armstrong v. Land & Marine Applicators, 463 So.2d 1327 (La.App. 5th Cir.1984).
[11] If we use the completion date for each home as the coverage trigger date, Valley Forge could be held liable in only three of the cases and Continental liable in only one. The other insurers then could be found liable as follows: Wausau, 15 cases; USF & G, 9 cases; Mission (LIGA), 15 cases; and Scottsdale, 11 cases.
[12] See, e.g., Nash v. Western Casualty & Surety Co., 406 So.2d 176 (La.1981); Jackson v. Welco, Mfg. of Texas, supra; Alberti v. WELCO Mfg. of Texas, supra; Prudential Prop. Cas. Ins. Co. v. Stuckey, 486 So.2d 352 (La.App. 3rd Cir.1986); Taillac v. Westminster Corp., 320 So.2d 580 (La. App. 4th Cir.1975), writ denied, 323 So.2d 472 (La.1975); Mut. v. Newark Ins. Co., 289 So.2d 237 (La.App. 1st Cir.1973), writ denied, 290 So.2d 910 (La.1974); Dee v. Republic Petroleum Corp, 413 So.2d 178 (La.App. 4th Cir.1972), writ denied, 420 So.2d 171 (La.1972).
[13] Using the discovery date as the trigger of coverage results in potential liability of the insurers as follows: Wausau, one case; USF & G, five cases; Valley Forge, 11 cases; Mission, two cases; Scottsdale, five cases; and Continental, 10 cases.
[14] The only case decided within this state that has dealt with the alienated premises exclusion is a federal case, Figgie International, Inc. v. Bailey, 25 F.3d 1267 (5th Cir.1994), which arose in the Western District of Louisiana. As noted by Valley Forge, although that case is factually different from the case, its end result was denial of coverage based on the insured's alienation of the premises.
[15] In Western World Ins. Co. v. Paradise Pools & Spas, Inc., supra, we construed and gave effect to the work exclusion and the products exclusions. We distinguish that case, however, because there was no language narrowing the work exclusion as there is here.