765 So.2d 485 (2000)
JAMES PEST CONTROL, INC., et al.
v.
SCOTTSDALE INSURANCE COMPANY.
No. 99-CA-1316.
Court of Appeal of Louisiana, Fifth Circuit.
June 27, 2000.
Writ Denied October 27, 2000.
*486 Michael H. Hogg, Rodney Kelp Littlefield, Perlis, Hogg & Reynolds, Metairie, Louisiana, Counsel for plaintiffs-appellees.
Frederick H.N. Dwyer, Bailey & Dwyer, Mandeville, Louisiana, Counsel for defendant-appellant.
Court Composed of Judges JAMES L. CANNELLA, SUSAN M. CHEHARDY and CLARENCE E. McMANUS
McMANUS, Judge.

STATEMENT OF CASE
This is a suspensive appeal from a district court judgment finding that the former insurer of a pest control business is liable for termite damage that manifested after the policy period. For the following reasons, we reverse.
The plaintiffs, James Pest Control and Louisiana Pest Control Insurance Company (hereafter LPCIC), filed suit against Scottsdale Insurance Company (hereafter SIC) alleging that SIC is liable for termite damage to a condominium, 809 Rue Royale, that occurred during James Pest Control's policy period with SIC. LPCIC avers that the damages occurred prior to the inception of its policy with James Pest Control, therefore, SIC is indebted to its insured James Pest Control pursuant to the terms of the insurance policy and to LPCIC by subrogation and assignment.
On March 19, 1996, James Pest Control and LPCIC filed its First Supplemental and Amending Petition averring that James Pest Control entered into a contract to treat the DeLimon Condominiums including 801 Rue Royale, 803 Rue Royale, 807 Rue Royale, 809 Rue Royale, 320 Rue St. Peter, 322 Rue St. Peter and 324 Rue St. Peter, all of which were found to have sustained termite damage. LPCIC paid the claims which totaled to $43,893.39. James Pest Control and LPCIC also aver that SIC was arbitrary and capricious in refusing to pay for the damages sustained in the condominiums.
On August 6, 1997, James Pest Control and LPCIC filed a Petition for Declaratory Judgment, seeking judgment declaring that SIC provided insurance coverage to James Pest Control during the period that the damages occurred to the properties named in the suit.
On February 10, 1998, SIC filed a Motion for Summary Judgment arguing that there is no genuine issue of material facts in this case and that SIC did not provide coverage because the termite damage did not occur during its policy period.
The trial court subsequently denied both the Petition for Declaratory Judgment and the Motion for Summary Judgment in open court. In a pre-trial order, the parties stipulated that the total amount of damages are $43,893.39. After trial on the merits on June 14, 1999, the trial court *487 rendered judgment for the plaintiffs in open court.
On June 28, 1999, the trial court signed the judgment rendered on June 14, 1999, in favor of James Pest Control, Inc. and LPCIC against SIC for these amounts:

801 Rue Royale (95% of $1154.52) $ 1,096.79
803 Rue Royale (80% of $2,522.23) $ 2,017.78
807 Rue Royale (95% of $14,066.25) $ 13,362.93
809 Rue Royale (80% of $7,481.64) $ 5,985.31
320 Rue St. Peter (80% of $2,518.00) $ 2,014.40
322 Rue St. Peter (95% of $12,448.00) $ 11,825.60
324 Rue St. Peter (80% of $3,662.75) $ 2,930.20
 ___________
 TOTAL $ 39,233.01

The trial court also awarded costs, expert fees in the amount of $400.00, and legal interest from the date of judicial demand which was September 28, 1995, for 809 Rue Royale and March 19, 1996, for the other condominiums. SIC timely appealed.
It was uncontested that SIC issued James Pest Control an occurrence type insurance policy. Over SIC's policy period, termite infestation and damage were discovered at the DeLimon Condominium Complex. On April 19, 1995, LPCIC replaced SIC as James Pest Control's insurer. Immediately after LPCIC began insuring James Pest Control, LPCIC was notified of termite damage at 801 Rue Royale, 803 Rue Royale, 805 Rue Royale, 807 Rue Royale, 809 Rue Royale, 320 Rue St. Peter, 322 Rue St. Peter, 324 Rue St. Peter.
Plaintiffs immediately notified SIC of the termite damage because they maintain that the damages occurred during SIC's policy period. SIC paid for the damages to 805 Rue Royale because the damage was discovered on April 18, 1995, however, SIC denied coverage for damages associated with the other units. In good faith, LPCIC paid the owners of the condominiums $43,893.39.

FACTS
At trial, Robert A. James, Sr., testified that he was the owner of James Pest Control from 1964 to 1995. James Pest Control was insured by SIC from April 18, 1989 to April 19, 1995. Around April of 1984, James Pest Control began treating the DeLimon condominiums. Mr. James testified that James Pest Control treated soil prior to laying the condominiums' foundation. After the condominiums were erected, James Pest Control trenched and treated around the perimeter of the building.
Mr. James testified that on June 15, 1993, the prospective owner spotted dead termites in 801 Rue Royale and James Pest Control inspected the condominium pursuant to that complaint. On June 9, 1994, James Pest Control found termite damage to the window frame and door-frames of 801 Rue Royale. The owner of 801 Rue Royale filed a claim, and SIC paid it. On May 12, 1995, James Pest Control was notified that there was a swarm of termites in the kitchen. On May 18, 1995, James Pest Control inspected a hole in the wall but saw no visible damage. On June 26, 1995, James Pest Control received a complaint that a few boards outside on the rear patio had old termite damage. On cross-examination, Mr. James testified that the first evidence of termite damage in 1995 at 801 Rue Royale was noted on June 27, 1995.
Mr. James testified that James Pest Control treated 803 Rue Royale in 1993 because either termites were spotted or the owners changed the soil. In 1994, James Pest Control inspected the condominium. On cross-examination, Mr. James testified that he first had notice that there was termite damage in 1995 at 803 Rue Royale on June 7, 1995.
Mr. James testified that James Pest Control was informed on May 8, 1995, of termite damage in the front wall and window at 807 Rue Royale. Mr. James testified that there was also evidence of termite tunnels in the ceiling wall on January 12, 1995, indicating old termite damage. On June 1, 1995, James Pest Control conducted an inspection of the condominium and found evidence of live termites in the wall. On cross-examination, Mr. James testified *488 that he first had notice that there was termite damage in 1995 at 807 Rue Royale on June 28, 1995.
Mr. James testified that on September 28, 1994, Formosan termites were found at 809 Rue Royale in the fascia boards on the left side of the porch. SIC paid for the damage to the fascia boards. On June 1, 1995, James Pest Control found termites in the front wall. On cross-examination, Mr. James testified that he first had notice that there was termite damage in 1995 at 809 Rue Royale on June 28, 1995.
On July 17, 1995, Mr. James testified that he had notice that termite damage was discovered at 320 Rue St. Peter. On July 18, 1995, James Pest Control first learned that 322 Rue St. Peter had live termites. Mr. James testified that he was first notified that there was termite damage at 322 Rue St. Peter on July 18, 1995.
On June 26, 1995, termites were found in the rear living room of 324 Rue St. Peter. On August 21, 1995, the area was treated by the front door to keep termites from entering the building. On cross-examination, Mr. James testified that he was first notified of termite damage at 324 Rue St. Peter on June 26, 1995.
Mr. James testified that he notified LPCIC of termite damage to condominiums 801 Rue Royale, 805 Rue Royale, 807 Rue Royale, and 324 Rue St. Peter on July 14, 1995. On July 17, 1995, Mr. James testified that he notified LPCIC that there was termite damage to 322 Rue St. Peter. Mr. James admitted that SIC usually paid the claims for termite damage when James Pest Control filed a claim.
Mr. James testified that Formosan termites did most of the damage, noting, however, termite sightings in a home does not indicate that there is damage to that home. Further, Mr. James testified that evidence of termite swarming is not evidence of damage to a building or structure. Mr. James stated that an infestation of termites occurs when over 100 termites are spotted in a building.
Mr. Robert Kunst was accepted by the trial court as an expert in the field of termites and aging termite damage. Mr. Kunst testified that he inspected James Pest Control's records, and he inspected the exterior of 801 Rue Royale, 803 Rue Royale, 805 Rue Royale, 807 Rue Royale, 809 Rue Royale, 320 Rue St. Peter, 322 Rue St. Peter, and 324 Rue St. Peter.
Mr. Kunst testified that termites attack a whole building and that there are two basic types of subterranean termites in Louisiana. He explained that the termites move their tentacles looking for cellulose material to eat, and as the termites find cracks in the structures, more termites migrate to the site until a colony developes within the structure. Mr. Kunst testified that the biomass of termites determines the rate at which a building or wood can be ingested. Mr. Kunst testified that termite damage occurs at a faster rate when the biomass of the termite colony increases. It is generally accepted in the pest control profession that if termites are found in a building, there must be termite damage. For example, the State of Louisiana specifies that there must be disclosure of termite sightings on the Wood Destroying Insect Reports as part of an act of sale for a house.
Mr. Kunst opined that most of the infestations in these condominiums began between 1990 to 1992. These condominium buildings were treated with chlorinated hydrocarbon, which is a chemical that is extremely repulsive to insects. The termites, according to Mr. Kunst, broke through one of the chlordane barriers or chlorinated hydrocarbon barrier by gaining access from the soil into the siding and moving up the exterior walls in the garage areas and the front of the buildings. The Rue Royale building was very heavily infested and the infestation probably began at 807 Rue Royale around 1990 and spread to the other condominiums. Another infestation began a year later at 801 Rue Royale, and the termites then moved to 805 Rue Royale in the early 1990's. *489 Around 1994, the termites moved to 809 Rue Royale. Mr. Kunst opined that 95 percent of the damage at 801 Rue Royale, 805 Rue Royale, and 807 Rue Royale occurred prior to the middle of 1995, 80-90 percent of the damage at 809 Rue Royale occurred prior to April 19, 1995, and that only 80-85 percent of the damage at 803 Rue Royale occurred prior to April 19, 1995.
He testified that the infestation at Rue St. Peter started in 322 in 1991. He testified that termites cover approximately ¼ to ½ mile when they forage and foraging increases as the colony increases. Mr. Kunst estimated that 80-85 percent of the damage occurred at 320 Rue St. Peter prior to April 19, 1995, 95 percent of the damage was done at 322 Rue St. Peter before April 19, 1995, and only 80 percent of the damage occurred prior to April 19, 1995 at 324 Rue Peter.
Mr. Kunst testified he did not make an estimate on the size of the colony, however, Mr. Kunst opined that Formosan termites caused the termite damage at the DiLimon Condominiums.
The trial court found for the plaintiffs and provided oral reasons for judgment. In its reasons, the trial court stated that the plaintiffs met their burden of proof in showing that the termite damage occurred during the SIC policy period. The trial court further noted that Mr. Kunst rationally set forth the development of termite infestation in those two buildings. SIC timely appealed. On appeal, SIC assigns these trial court errors:
1) The trial court erred in finding that termite damage "manifested" during SIC's policy period.
2) Robert Kunst, plaintiffs' expert, was not qualified to testify as to the occurrence of termite damage.
3) The trial court erred in finding that LPCIC met its burden of proof in establishing subrogation rights.
We find merit in SIC's first specification of error and pretermit the others.

Insurance Policy Coverage
In this specification, SIC argues that it does not provide coverage under its policy because the damage manifested itself during LPCIC's coverage period which commenced after April 19, 1995. SIC specifically argues that the manifestation theory as set forth in Korossy v. Sunrise Homes, Inc., 94-473 (La.App. 5 Cir. 3/15/95), 653 So.2d 1215, writ denied, 95-1536 (La.9/29/95), 660 So.2d 878 (La.1995) is controlling in this case and that the property damage does not result until the damage manifests itself on the date of discovery.
James Pest Control and LPCIC respond that the termite damage occurred during SIC's policy period as noted by Mr. Kunst, plaintiffs' expert. James Pest Control and LPCIC further respond that Korossy is distinguishable on its facts because the Korossy court did not have any evidence on when the damage occurred, and thus, could not rule as to when the damage occurred while, conversely, there is credible evidence in this case that the damage occurred prior to April 19, 1995.
The issue before this Court is whether the trial court erred in its implicit finding that the termite damage in these condominiums was caused by an occurrence during SIC's policy period.
The insuring agreement of the SIC policy states:
1.a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.
The Insuring Agreement further states that:

*490 b. The insurance applies to "bodily injury" and "property damage" only if
(1) The "bodily injury" or "property damage" is caused by an "occurrence"that takes place in the "coverage territory"; and
(2) The "bodily injury" or "property damage" occurs during the policy period.
The SIC policy defines "occurrence" and "property damage" as follows:
9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
12. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.
The insuring agreement of LPCIC states:
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage"to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered. This insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown in the Declarations. The "bodily injury" or "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages.
The insuring agreement of LPCIC further states that:
9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
12. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of that property; or
b. Loss of use of tangible property that is not physically injured.
In Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190, 192 (La.1974), the insured was a welding contractor who performed a defective weld on a crane boom during the policy period. After the policy expired, the weld failed and the boom collapsed. Oceanonics, 292 So.2d at 190-191. The court applied the language of the policy's "occurrence" definition ("an accident `which results, during the policy period, in bodily injury or property damage' ") and concluded public policy does not prohibit an insurer from exclusion of coverage for damage accidentally occurring after the policy expiration but resulting from a delictual act committed during the policy period, especially considering that the insured had the opportunity to protect himself against such risk by continuously maintaining liability coverage from the completed operations and products liability hazards. Id. The Supreme Court held that there was no coverage because the damage manifested itself after the policy expired. Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190, 192 (La. 1974).
In Cole v. Celotex Corporation, 599 So.2d 1058 (La.1992), the Supreme Court adopted the "exposure theory" under which "coverage is triggered by the exposure to the harmful conditions during the policy period." Cole, 599 So.2d at 1076. In Cole, the jury determined that nine corporate executive officers were negligent in failing to provide plaintiffs, who had contracted an asbestos-related occupational disease, with a safe place to work from 1945 through 1976. Cole, 599 So.2d at *491 1061-62. The court noted that, if coverage during the exposure period were provided by multiple insurers, it would be necessary to rule that an insured may recover under all available coverages up to the limits of each policy. Cole, 599 So.2d at 1079. The Supreme Court considered and rejected the "manifestation theory" under which coverage is triggered only under the policy in effect when the injury becomes manifest because the Supreme Court concluded that the key relevant events giving rise to a claim in a long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later. Cole, 599 So.2d at 1066.
In an opinion, this Court found a similar definition of "occurrence" in a contractor's general liability policy was ambiguous. Western World v. Paradise Pools & Spas, 93-723 (La.App. 5 Cir. 2/23/94) 633 So.2d 790, involved claims for damage to a swimming pool by cracks which developed in the pool walls and the patio decking surrounding it. This Court concluded the definition of "occurrence" was ambiguous because it was defined as "an accident, including continuous or repeated exposure to conditions" and thus could be construed to include development of cracks in the swimming pool, so that the policy in that case covered the damages. Western World, 633 So.2d at 794.
In Korossy v. Sunrise Homes, Inc., 94-473 (La.App. 5 Cir.3/15/95), 653 So.2d 1215 (La.App. 5 Cir.1995), writ denied, 95-1536 (La.9/29/95), 660 So.2d 878 (La.1995), this Court adopted the manifestation theory as the trigger of coverage for a property damage claims. In Korossy, the plaintiffs filed suit against a developer alleging that faulty construction and defective building materials resulted in excessive settlement. This Court determined that it must choose between the "exposure theory" and the "manifestation theory" and chose the "manifestation theory," concluding that "the effects of excessive settlement did not become `damage' until it was discovered by the homeowners." While this court noted that damage certainly may have occurred before it was discovered, this Court concluded that the manifestation theory should be applied because the effects of the differential settlement of the houses did not become "damage" until it was discovered by the homeowners. Korossy, 653 So.2d at 1226. Although Korossy, supra, did not distinguish Cole, supra, it is apparent that the application of manifestation theory eliminates the difficult factual issue of determining when a hidden property damage actually occurs, a proof problem that is not as difficult in asbestos cases when the dates of injurious exposure to a substance can usually be determined. Accordingly, we find that the manifestation theory is applicable in this case and that the effects of the termite infestation in the condominiums did not become "damage" until it was discovered by the homeowners.
Further, Mr. James, the claimant, testified that he did not become aware that the termite infestation caused the damage on all of the condominiums except 805 Rue Royale until after April 19, 1995. Mr. James explained that the presence of termites does not necessarily mean that there is damage to a building and that it is difficult to ascertain when exactly the damage occurs.
We note that while the termite damage to 807 Rue Royale manifested itself after April 19, 1995, the insuring agreement between SIC and James Pest Control provided that SIC pay for any damage discovered within one year of an inspection if the inspection occurs during the policy period. Since James Pest Control inspected 807 Rue Royale in January of 1995, SIC is liable for the damages to that condominium pursuant to the terms of its insuring agreement. Since the termite damage manifested after April 19, 1995 at 801 Rue Royale, 803 Rue Royale, 809 Rue Royale, 320 Rue. St. Peter, 322 Rue St. Peter, and 324 Rue St. Peter, LPCIC is *492 liable for the entire amount of those damages.
For the foregoing reasons, we reverse the trial court's judgment and find LPCIC liable for all of the damages to 801 Rue Royale, 803 Rue Royale, 809 Rue Royale, 320 Rue St. Peter, 322 Rue St. Peter, and 324 Rue St. Peter. We find that SIC is liable for all of the damages to 807 Rue Royale. All costs associated with this appeal are assessed equally between the parties.
REVERSED.