919 So.2d 758 (2005)
Joseph GREFER, et al.
v.
TRAVELERS INSURANCE COMPANY, et al.
No. 04-CA-1428.
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 2005.
*761 Stephen B. Murray, Arthur M. Murray, Dominick Impastato, Murray Law Firm, and Stuart H. Smith, Michael G. Stag, Smith Stag, LLC, and William A. Porteous, III, Porteous, Hainkel, & Johnson, LLP, New Orleans, LA, for Plaintiff/Appellee, Cross-Appellants, Joseph Grefer, Camille Grefer, Rose Marie Grefer Hasse, Rose Marie Grefer and Henry Grefer (The Grefer Family).
Erin Fury Parkinson, Margaret Diamond, McGlinchey Stafford, PLLC, New Orleans, LA, for Defendant/Appellee-3rd Appellant, Employers Mutual Casualty Company.
David F. Bienvenu, Shawn L. Holahan, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, for Defendant/Appellee-2nd Appellant, The North River Insurance Company, United States Fire Insurance Company, and TIG Insurance Company.
Edward J. Koehl, Jr., L. Etienne Balart, Jones, Walker, Waechter, Poitevent, Carrère & Denègre L.L.P., New Orleans, LA, for Defendant/Appellant, The Gray Insurance Company.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and JAMES C. GULOTTA, Pro Tempore.
THOMAS F. DALEY, Judge.
This suit arises out of previous litigation in Orleans Parish[1] wherein plaintiffs, the Grefers, sued Intracoastal Tubular Services, Inc. (ITCO), Exxon Mobil Corporation (Exxon), and others for environmental property damage to the Grefers' immovable property, a 33-acre industrial tract situated in Harvey, Louisiana. The Grefers leased various portions of this tract at different times to ITCO from 1968 to 1992. ITCO was an oilfield pipe cleaning, storage, and trucking operation that, among other related operations, cleaned and stored new and used oilfield pipe, primarily for Exxon. ITCO's operations were performed both on land owned by *762 ITCO and the land ITCO leased from the Grefers.
ITCO was a successor company to several different entities all owned by the Hooper Family and all involved in the business on the Grefer Tract. In 1992, ITCO was liquidated and terminated its leases with the Grefers. In 1996, the Grefers discovered that their land had been contaminated by a substance found in some of the pipe scale called NORM[2], a waste product from the pipe cleaning process, as a result of ITCO's operations on their land. The Grefers sued ITCO, Exxon, and other entities in Civil District Court in New Orleans for environmental property damage to the Grefer tract. The CDC jury rendered a verdict in favor of the Grefers against Exxon (85%), ITCO (5%), and two other entities (5% each) for compensatory damages of $145,000 and remediation costs of $56 million. Additionally, the jury awarded the Grefers exemplary damages against Exxon. The jury also awarded ITCO full indemnity against Exxon. Exxon filed a suspensive appeal, while ITCO filed a devolutive appeal. During the briefing stage of this appeal, the Fourth Circuit affirmed this judgment, but reduced the exemplary damages against Exxon.[3]
While the appeal in the CDC litigation was pending, the Grefers filed the instant suit in Jefferson Parish, styled as "Petition to Collect Judgment Against Debtors Under Insurance Contracts" against various insurers of ITCO. These insurers were not sued in the CDC litigation and did not directly participate in that case. Each insurance company denied coverage and issued reservations of rights letters. While the instant suit was pending, the Grefers entered into settlements, compromises and/or loan agreements with several of ITCO's insurers. Trial proceeded against the remaining non-settling insurers, The Gray Insurance Company (who issued several CGL and excess policies to ITCO), the "TIG Group" (North River Insurance Company, United States Fire Insurance Company, and TIG Insurance Company, who issued CGL and excess policies to ITCO), and Employers Mutual Insurance Company (who had issued excess policies to ITCO).
The suit went to trial on May 3, 2004, and on June 15, 2004, the trial court rendered judgment in favor of the Grefers against The Gray Insurance Company, the TIG Group, and Employers Mutual, expressly finding that those policies provided coverage for the judgment against ITCO in the CDC suit. No monetary judgment was awarded.
The Gray Insurance Company has appealed, arguing several Assignments of Error. First, they argue that the trial court erred in its factual finding that Gray's insurance coverage period extended from 1985 to 1992. Second, the trial court erred in finding coverage when it found as a fact no occurrence during the period that Gray CGL and excess policies were in force and effect. Third, the trial court erred in not applying the "own, rent, or occupy" exclusions in the Gray polices to deny coverage. Fourth, the trial court erred in declaring that the pollution exclusions in the Gray policies did not exclude *763 coverage. Fifth, the trial court erred in declaring that the Gray policies provided coverage for ITCO's breach of its contract of lease.
The TIG Group also appealed, arguing that the trial court erred in applying the "exposure" trigger rather than the "manifestation" trigger for determining coverage for the environmental property damage.[4] They also argue the same errors as Gray argues regarding the "own, rent or occupy" and pollution exclusions in the policies.
Employers Mutual also argues the "own, rent or occupy" and pollution exclusions, since their excess policies "followed form." Employers Mutual additionally argues that their excess coverage has not been reached, contending that if the underlying coverage is allocated across the shortest period of coverage, 24 years, the annual losses do not reach the attachment point of any Employers Mutual excess liability policy. Finally, Employers Mutual argues that they are entitled to a credit for the full limits of the settling carriers' policies, and as such, they are not liable for any amount of the CDC judgment.
The Grefers have answered the appeals, and argue first that the defendants' appeals are premature, inasmuch as the judgments below do not fully dispose of all the issues in the case since the Grefer family sought execution and a money judgment against the insurers. They argue that this appeal should be dismissed and the matter remanded to the trial court for the rendering of a money judgment. Next, the Grefers argue that the trial court erred in failing to hold that damages the Grefers sustained after 1987 were insured by the defendants.
The evidence at trial[5] established that ITCO's predecessor company began as a small family business around 1935 performing oil field pipe storage operations on its own property. The company expanded volume and services to include pipe cleaning, testing, inspection, threading, and transportation (trucking). John Hooper, the owner of ITCO, testified at the CDC trial that from the late 1960s and 1970s onward, 95% of ITCO's business came from Exxon. In response to the growing demand from Exxon, ITCO began leasing sections of the adjacent Grefer property in 1968. ITCO leased eight separate parcels of the Grefer tract, as follows: G1 (12/5/73-12/4/88), G2 (6/1/73-5/31/92), G3 (4/1/68-5/31/92), G4 (2/1/74-1/31/90), G6 (6/15/74-6/14/92), G7 (3/1/75-3/31/85), G8 (4/1/74-3/31/85), and G9 (9/1/75-8/31/85). There was no G5 lease.
ITCO reached its business peak around 1981, with over $20 million in gross annual revenue. The evidence at the CDC trial established that on March 27, 1987, Exxon officials met with ITCO to inform them that the scale in Exxon's used oil field pipe had been found to be contaminated with Naturally Occurring Radioactive Material, or NORM, that was a byproduct of the oil drilling process. The record also established that Exxon had known of presence of NORM in its domestic used pipe since 1986, several months before it notified its contractors, of which ITCO was one. The evidence likewise established that upon learning this information, ITCO decided not to clean any more NORM-contaminated pipe. Pipe was received at ITCO's Main Yard, which was not part of the Grefer tract, and tested for NORM. Contaminated pipe was segregated at the Lower Yard, also not a part of the Grefer tract. ITCO designed and built a controlled *764 environmental cleaning unit for contaminated pipe, but this unit was never utilized commercially after an initial test run in June of 1987.
In 1992, facing a decline in business, ITCO was liquidated and negotiated early releases of the outstanding Grefer leases. The trial court found that in 1996, property owner Judge Joseph Grefer first learned that the Grefer property contained areas of radioactive contamination from the pipe cleaning activities of ITCO. The Grefers' CDC suit followed thereafter.

The Gray Insurance Company's Policies Coverage Periods
First, Gray argues that the trial court erred, in its Reasons for Judgment, in finding that Gray's coverage spanned from 1985 until 1992. They argue that their first policy's coverage began on October 1, 1987. Gray entered three CGL policies into evidence: CGL policy from October 1, 1987 to October 1, 1988, CGL policy from October 1, 1988 to November 1, 1990, and CGL policy from November 1, 1990 to May 31, 1992. Gray entered two "follow form" excess policies into evidence, one with coverage for the policy period November 1, 1990 to November 1, 1991, and one with coverage for the policy period November 1, 1991 to May 31, 1992.
Gray acknowledges that they had a twenty percent participating interest in a CGL policy with North River Insurance Company, effective October 1, 1985 until October 1, 1986, which is entered into evidence and noted as policy GA-10157/North River policy XS-6036.[6] Liability under this policy will be considered with the other TIG Group policies below. Gray also issued to ITCO an Aggregate Excess Liability policy, GA-10158, with coverage from October 1, 1985 to October 1, 1987, entered into evidence as Plaintiff's Exhibit 44.
In its Reasons for Judgment, the trial court states that Gray provided coverage to ITCO from 1985 until 1992. The trial court describes all of the policies (Gray's policies and those of the TIG Group and Employers Mutual) as CGL policies (pp. 2-3, Reasons for Judgment). Further, in its analysis, the trial court described various terms and exclusions in those policies, such as the pollution exclusions, which are not present in GA-10158. Gray policy GA-10158 is clearly not a CGL policy; it is an Aggregate Excess Liability policy, or stop-loss policy, as explained by Floyd Sibley of Gray in his deposition. This policy only provides for reimbursement to ITCO when ITCO has made various payments under its self-insured retentions, which exceed an aggregate limit based upon an established loss fund. See LSA-R.S. 22:675(A) and (G)(2). As such, the policy provides reimbursement only to ITCO, not payment of damages to third party claimants. Accordingly, we find that Gray policy GA-10158 does not apply to the plaintiffs' claim, since it is not a CGL policy. Clearly, in its Reasons for Judgment, the trial court did not apply this policy and clearly considered only the CGL policies, given its analysis of the various terms and exclusions found in the CGL policies, but not in this policy.
The evidence shows that, other than Gray's 20% participating interest in the North River policy noted above, Gray did not issue other applicable insurance to ITCO prior to its first CGL policy issued on October 1, 1987.

Occurrence: "Manifestation" or "Exposure" Trigger
Gray argues that the trial court erred in finding coverage under its CGL policies *765 when it found as a fact no occurrences during the periods that Gray CGL and excess policies were in force and effect. TIG argues that the trial court erred in applying the "exposure" trigger rather than the "manifestation" trigger for determining coverage for the environmental property damage. Both of these Assignments of Error are related and will be discussed together.
In a Summary Judgment rendered on August 12, 2003, the trial court held that the "exposure" trigger for coverage applied in this case. The trial court relied on Cole v. Celotex Corp., 599 So.2d 1058 (La. 1992), to hold that insurance coverage in this case is triggered by the occurrence of exposure of the property to the contaminants during the policy period. The defendants argue that in a property damage case such as this, the Louisiana rule is that the manifestation of the damages during the policy period is the coverage trigger, citing Korossy v. Sunrise Homes, Inc., 94-473 (La.App. 5 Cir. 3/15/95), 653 So.2d 1215, and James Pest Control, Inc. v. Scottsdale Ins. Co., 99-1316 (La.App. 5 Cir. 6/27/00), 765 So.2d 485. The defendants argue that the exposure trigger should only apply in a bodily injury/latent disease case.
Gray argues that under either trigger, exposure or manifestation, no occurrence triggering coverage happened during any of its policy periods, because the trial court found as a fact that the latest date of exposure to the Grefer tract was March 27, 1987. Since Gray's CGL coverage commenced on October 1, 1987, and ended in 1992, they argue that there was no "occurrence" (no exposure or manifestation of the property damage) during their policy periods.
Gray's policies state that
This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence."
The polices define occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined as "physical injury to tangible property." Clearly, given this plain and clear language, the trial court's finding that the exposures were the proper coverage trigger under the Gray policies was correct, without having to resort to reliance on the reasoning in Cole.
The trial court clearly erred, however, in finding coverage under the Gray policies, because the evidence shows that there were no occurrences during the Gray policy periods. The trial court found as a fact that no more exposures occurred on the Grefer tract after March 27, 1987. This finding of fact is amply supported by evidence in the record. This is the date on which Exxon informed ITCO that its used pipe contained NORM. The testimony and evidence show that ITCO cleaned no more NORM pipe on the Grefer tract after this date. Michael Bulot, an employee of ITCO who worked there in 1987, testified that all incoming pipe was tested for radioactivity at ITCO's Main Yard, where it was received. If it tested "above background," it was segregated and moved to ITCO's Lower Yard, not the Grefer Tract. Therefore, the trial court's finding that the Gray policies commencing on October 1, 1987 and ending in 1992 provided coverage for damage to the Grefer tract is reversed.
The TIG Group argues that the manifestation rule applies, and that the damage manifested itself in 1996, when Judge Grefer was informed about the presence of the radioactive contamination on his property, and, therefore, there is no coverage under the TIG Group's *766 policies, which, including excess policies issued by North River and International Surplus Lines Insurance Company, were issued for periods between October 1, 1981 through October 1, 1986 (these policy numbers are listed in pp. 4-5 of TIG Group's brief). TIG Group does not contest the fact that exposures occurred during the TIG Group's policies' periods.
TIG quotes the following definition of "occurrence" from their policies:
To mean a single event or origination cause, including all resultant or concomitant or concatenated series of occurrences regardless of the number thereof, or whether at one or more locations, or it shall mean a continued or repeated exposure to conditions occurring during the Policy Period and which result in injury to persons or damage to property during the Policy Period provided such injury or damage is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence ... (emphasis added)
We find that this definition of occurrence supports the trial court's finding that coverage under the TIG Group's policies was triggered. Clearly, the dispersals of the scale occurred during the policy periods. Clearly also, the property damage occurred during the policy period. The radioactive scale falling to the ground and/or its mixture with soil and use as fill on the Grefer tract occurred during the TIG policy periods and constituted the property damage in this environmental pollution case, as was noted by counsel for the Grefers (Mr. Stag, R @ 4172).
The Korossy and James Pest Control cases dealt with factual scenarios (differential settlement of homes; termite damage) that, when applied to occurrence language in the respective policies, rendered that language ambiguous. Both courts then used the manifestation trigger to determine coverage under their policies' language. As the court noted in James Pest Control:
Although Korossy, supra, did not distinguish Cole, supra, it is apparent that the application of manifestation theory eliminates the difficult factual issue of determining when a hidden property damage actually occurs, a proof problem that is not as difficult in asbestos cases when the dates of injurious exposure to a substance can usually be determined.
The factual scenario here does not render the occurrence language in the TIG policies ambiguous. The trial court did not err in finding that coverage was triggered under the TIG Group policies.

Pollution Exclusions
The trial court found that pollution exclusions in the Gray and TIG Group policies (and Employers Mutual) did not apply, relying on the factors set out by the Supreme Court in Doerr v. Mobil Oil Corp., XXXX-XXXX (La.12/19/00), 774 So.2d 119. The Doerr court held that the total pollution exclusion of a commercial general liability (CGL) insurance policy is not designed or intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind; rather, it must be construed in light of its general purpose, which is to exclude coverage for environmental pollution (Emphasis added).[7]
The Doerr court set forth the law on insurance contracts as follows (cites omitted):
An insurance policy is an aleatory contract subject to the same basic interpretive *767 rules as any other contract. The interpretation of an insurance contract is nothing more than a determination of the common intent of the parties. Obviously, the initial determination of the parties' intent is found in the insurance policy itself. In analyzing a policy provision, the words, often being terms of art, must be given their technical meaning. When those technical words are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written. If, on the other hand, the contract cannot be construed simply, based on its language, because of an ambiguity, the court may look to extrinsic evidence to determine the parties' intent.
When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy. Importantly, when making this determination, any ambiguities within the policy must be construed in favor of the insured to effect, not deny, coverage.
Doerr v. Mobil Oil Corp., 774 So.2d at 123-124.
The Doerr court held that the applicability of a total pollution exclusion in any given case must necessarily turn on several considerations:
(1) Whether the insured is a "polluter" within the meaning of the exclusion;
(2) Whether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and
(3) Whether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy.
The trial court recognized that the CDC jury found that ITCO was a polluter, but the trial court found that ITCO was not a "polluter" within the meaning of this exclusion. The trial court found that the first part of the test was not met: ITCO was not a "polluter" because it did not know that the pipe scale, the waste product from the pipe cleaning process, contained the radioactive contaminant. The trial court also found that the third part of the Doerr test was not met, whether there was a "discharge, dispersal, seepage, migration, release, or escape of a pollutant by the insured," though the trial court fails to provide reasons for this conclusion.[8] The defendants urge this court to reverse the trial court's ruling, arguing that Doerr requires only that ITCO's actions that caused the pollution be active and purposeful.[9]
The Doerr court gave these guidelines for application of its three-part test:
First, the determination of whether an insured is a "polluter" is a fact-based conclusion that should encompass consideration of a wide variety of factors. In making this determination, the trier of fact should consider the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, *768 who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion.
Second, the determination of whether the injury-causing substance is a "pollutant" is also a fact-based conclusion that should encompass a wide variety of factors. As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy. For example, under pollution exclusions similar to the one at issue here, courts have found "pollutant" to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that "pollutants" do not include muriatic acid, styrene resins, and other forms of pesticide. See Russ, supra, at § 127:12 (collecting authorities). Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion.
Finally, the determination of whether there was "discharge, dispersal, seepage, migration, release or escape" is likewise a fact-based conclusion that must result after a consideration of all relevant circumstances. Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other factor the trier of fact deems relevant. These factual conclusions should be made to assist a court in determining whether the total pollution exclusion in any particular case will exclude coverage for a claim.
In its Reasons for Judgment dated June 15, 2004, the trial court said:
"This court finds that while ITCO was deemed a polluter [in the CDC case] for purposes of legal liability, it is not and [sic] active polluter in terms of this pollution exclusion. ITCO was not an active polluter of the environment as defined by the Doerr case. Its activities consisted of scraping scale from oil field pipe, which appeared to the ITCO workers to be rust and dirt. ITCO claims it had no knowledge it was dealing with anything that threatened the environment. Therefore, the release of radioactive material onto the property was unintentional and ITCO should be deemed only negligent in their dispersal of the materials. Just because ITCO played a role in distribution of the radioactive material does not make ITCO an active polluter.
We turn now to an analysis of the record evidence and the Doerr factors. Regarding the first prong of the test, whether ITCO was a "polluter," the Doerr court put together a list of a "wide variety" of fact-based factors for courts to consider, but with no guidance on the relative importance of each factor. We find that the nature of the insured's business and whether the insured's business presented a risk of pollution are of paramount consideration and are clearly the most important factors in the "polluter" test.
The nature of ITCO's business was the cleaning and recycling of used oilfield pipe. Oil drilling and related activities present a clear and obvious risk of pollution. The cleaning of used oil field drill pipe is an oil extraction related activity. Materials extracted *769 from the ground through oilfield drill pipe, such as oil, sludge, grease, salt water, and other hazardous and/or toxic oil production waste, are all potential pollutants.[10] As explained in the "Background History" section of the Fourth Circuit opinion in Grefer v. Alpha Technical, drill pipe had to be cleaned because scale built up inside the pipe, restricting the flow of oil.[11] The scale or crust, which formed on the inside of the pipe, was caused by mineral salts that precipitated out of the fluids extracted through the pipe.
"To pollute" is defined in Webster's II New College Dictionary as, "To make unfit for or harmful to living things, esp. by the addition of waste matter." Waste is defined as: "A worthless or useless by-product." ITCO's cleaning process removed scale, which was a waste product, consisting of barium sulfate, strontium sulfate, calcium sulfate, calcium carbonate, and radium sulfate.[12] The handling and disposal of that waste presented a risk of pollution. The degree of risk depends on the nature and the volume of the waste product.
The trial court recognized, in its Reasons for Judgment, that "massive amounts of scale were discharged by ITCO." This finding of fact is amply supported by the record testimony of ITCO officers and employees. Michael Bulot, an employee of ITCO during the years in question, testified that pipe cleaning was dirty work. He testified that a machine he operated would clean approximately 300 joints of pipe per day. A pipe with light scale would produce approximately a half pound of scale; a heavily crusted pipe might produce around two pounds of scale. The scale fell to the ground and was also blown into the air. Bulot testified that the scale waste was mixed with soil and used to fill holes all over the property at least twice per week, all the time he was employed. John Hooper, the owner of ITCO, corroborated Bulot's testimony regarding the use of the scale to fill holes all over the property. Based on the fact that the drill pipe that was cleaned knowingly came into contact with pollutants, coupled with the fact that the cleaning process produced large amounts of waste, leads us to conclude that the business of recycling or cleaning oil drilling pipe by its very nature presents a risk of pollution.
Next, the Doerr court directs us to consider the evidence of ITCO's insurance coverage. The evidence shows that ITCO did not have a separate pollution coverage policy, even after March 27, 1987, when ITCO was clearly informed about the presence of NORM in the used pipe scale. Norman Cook, an insurance agent who placed various coverages for ITCO beginning in 1980, testified that in 1989, Mr. Hooper of ITCO asked him about obtaining a separate pollution coverage policy, and that he forwarded to Hooper a blank application for this coverage with another insurance company (not Gray), but that the application was never returned. Cook testified that Gray did not write Pollution Coverage. He stated that Gray did not quote ITCO rates for Pollution Coverage, and that he advised ITCO that Gray was not including Pollution Coverage in the quote. Cook testified that he told Hooper that the Gray CGL policies contained pollution exclusions.
*770 David Daigle of Gray Insurance testified that he performed underwriting services for ITCO. Daigle identified the quote that he furnished to Norman Cook for 1987. The document stated that the quote did not include pollution coverage. Daigle testified that he advised Norman Cook of this fact. This testimony established the fact that ITCO knew that Gray's CGL policies did not include pollution coverage, and that ITCO did not take initial steps to obtain pollution coverage from Cook's agency until 1989, two years after it learned about the NORM.
We find that whether ITCO or any defendant had separate pollution coverage is of very limited value in determining their status as a polluter. Consideration of existing insurance coverage could have some applicability when there are several different insurance policies covering the same period and the court is called upon to determine which of those policies may exclude pollution coverage, but this consideration has very limited value in determining whether or not a particular policy does or does not cover pollution. If courts were to apply this consideration in the absence of competing policies, they would be suggesting that the absence of a separate pollution policy is an indication that the pollution exclusion in the existing policy should not be applied. Businesses could seek to avoid the label "polluter" by consciously refusing to purchase separate pollution coverage if that purchase could be construed as an "admission" that their businesses present the risk of pollution. We do not believe the Supreme Court intended such a result, so we find this factor is not applicable in this case.
The third consideration is whether the insured should have known from a reading of the exclusion that a separate policy covering pollution damages would be necessary. In the Gray policies, the exclusionary language provided that the insurance does not apply to "property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants (a) at or from premises you own, rent, or occupy . . ." Pollutants are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed."
The TIG Group's policies' exclusion language provided that the insurance does not apply to "property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental."
A clear reading of the exclusion language in the applicable policies suggests that a reasonable person, upon reading the same, would be on notice that should they desire pollution coverage, they should obtain a separate policy. This conclusion is supported by ITCO's own action seeking pollution coverage, as testified to by Mr. Cook.
As to the next two factors, who the insurer typically insures and a consideration of other claims made under this policy, there was no evidence presented at trial as to who Gray or the TIG Group insure, and there was no evidence taken as to other claims made under these policies, and so we find these two factors are not relevant here.
Finally, the Supreme Court suggests, in very broad and expansive language, that the trier of fact can consider any other factors deemed relevant to the conclusion of whether or not the insured is a polluter. *771 We reiterate our belief that the most important consideration in the insured's status as a polluter are the first two factors, the nature of the insured's business and whether it presents a risk of pollution. Accordingly, we find that the evidence clearly shows that ITCO was a polluter within the meaning of the exclusion.
We find the case of Pro-Boll Chemical & Fertilizer Co. Inc. v. U.S. F & G, 2004 WL 3494045 (W.D.La.11/15/04) persuasive. Plaintiff Pro-Boll, a licensed producer of pesticides, sued several of its CGL carriers seeking costs it incurred as a result of an environmental cleanup of its own facility due to a contamination of that facility with toxaphene. The trial court found that Pro-Boll was clearly a "polluter" under the Doerr test, because the nature of its business clearly presented a risk of pollution. Additionally, the court found that Pro-Boll clearly knew that a separate policy covering pollution damages would be necessary for its business, since it had begun to purchase such a separate "pollution hazard insurance" as early as 1992.
The trial court has erroneously read into the Doerr test for "polluter" a requirement that the insured have scienter or knowledge that the substance it dispersed "threatened the environment."[13] The test for a "polluter" under Doerr does not contain that requirement or the requirements found by the trial court in the above quoted paragraph. The trial court found that because ITCO did not know, it should be deemed only negligent in its dispersal of the contaminated pipe scale. The issue of negligence, however, goes to the third part of the Doerr test, regarding the action of the "dispersal."
The second prong of the Doerr test is whether the injury-causing substance is a "pollutant." The trial court in CDC found that NORM was clearly a pollutant. The trial court in this case adopted that finding, and no party appeals it.[14] Other courts have also come to the same conclusion. See U.S. F & G v. B & B Oil Well Service, Inc., 910 F.Supp. 1172 (S.D.Miss.6/12/95) (trial court has "no difficulty in concluding that NORM is, in fact, a pollutant within the policy's definition of that term.").
The third Doerr prong requires a determination of whether there was a discharge, dispersal, seepage, migration, release, or escape of the pollutant. The Supreme Court instructs that the trier of fact should first consider whether the pollutant was intentionally or negligently discharged.[15] The Doerr court referred to the act of dispersal as intentional or negligent, not the polluter's knowledge of the specific characteristics of the pollutant. In this case, it is clear that the scale was intentionally discharged. ITCO's actions were intentional in the sense that they were active and purposeful. The very nature of their business was to clean pipe. Pipe scale containing NORM was forcibly removed or discharged from sections of drill pipe. The amount of pipe scale waste generated was massive. The scale was released on to the ground and then dispersed throughout the Grefer property. ITCO personnel knowingly collected this pipe scale and used it all over the property *772 to fix holes, on the order of twice a week for many years. These actions were neither accidental nor negligent; they were active, purposeful and intended.
As the court noted in U.S. F & G v. B & B Oil Well Service, Inc.:
Most courts agree that where there has been a discharge or release of contaminants, the fact that an insured did not intend the damages that arose from such discharge or release does not alter the applicability of the exclusion. That is, the fact that the damages were unexpected or unintended is not material in determining the applicability of this pollution exclusion. See, e.g., United States Fidelity & Guar. Co. v. T.K. Stanley, Inc., 764 F.Supp. 81, 83, 84 n. 4 (S.D.Miss.1991) (an interpretation of phrase "sudden and accidental" which focuses on the damages, rather than the act that caused the damage, is at odds with the express language of the exclusion). This view is in keeping with the clear language of the exclusion, which makes the sudden and accidental exception applicable only if "the discharge, dispersal, release or escape is sudden and accidental;" the exception is not implicated merely because the damages may have been accidental, in the sense that they were unexpected or unintended. What is relevant is whether the insured expected or intended the discharge or release.
In this same vein, the fact that the insured may not have known and may not have expected or intended that its discharge contain "smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants" is immaterial. See St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1203 n. 5 (1st Cir.1994) ("[I]t is not relevant whether or not Warwick actually knew that its waste materials contained hazardous substances.... The exclusion bars coverage so long as the discharge of `waste materials' was expected and intended and as long as the property damage is `arising out of this discharge."). (Cite omitted).
We find this reasoning persuasive.
The trial court supported its conclusion by noting that ITCO did not employ any scientists or research staff and that Exxon was in a better position to know what constituted hazardous materials. We agree that Exxon was in a better position, and find that the jury in the CDC trial took that into consideration when it assigned 85% of the fault to Exxon and only 5% to ITCO, and further when it awarded ITCO full indemnification from Exxon.
Accordingly, the trial court's finding that the pollution exclusions in the defendants' policies do not apply to the Grefers' claim is reversed.

"Owned-Leased Property" and "Care, Custody, and Control" Exclusions
It is undisputed that ITCO leased land from the Grefers upon which to perform ITCO's business operations. Gray and the TIG Group argue that the policy exclusions for property the insured owns, rents, or occupies apply to deny coverage. The trial court found that the exclusions did not apply to bar coverage.
In Ledbetter v. Concord General Corp., 95-0809 (La.1/6/96), 665 So.2d 1166, judgment amended, 95-0809 (La.4/18/96), 671 So.2d 915, the Supreme Court set forth the following legal axioms concerning the interpretation of insurance policies. The court stated:
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. The parties' intent, as reflected by the words of the policy, determines the *773 extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written.
Exclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured. However, the rule of strict construction does not "authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists." Insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. (Cites omitted.)
In an earlier Summary Judgment, the trial court found that the Care, Custody, and Control exclusions did not apply because "air and ground water are fugacious, and radioactive contamination of both ground water and air pose a threat to third parties . . ." We find that in this case, there was no evidence presented regarding contamination to the air and groundwater. Further, the trial court clearly decided only the cause of action for liability for damage to the Grefer tract itself. The trial court severed any and all claims for damages that third parties may have.[16] These claims were not decided by the trial court in the judgment on appeal and are not before us now.
In the same Summary Judgment, the trial court gave the following Reasons for Judgment:
Louisiana courts have long enforced the owned-leased property exclusions and care, custody and control exclusions in Commercial General Liability Policies ("CGL"). Thomas W. Hooley & Sons v. Zurich Gen. Acc. And Liab. Ins. Co., [235 La. 289,] 103 So.2d 449 (La.1958). The purpose of such exclusions is "to protect insurers from the risks concerned in insuring property under the care, custody or control of the insured in the sense of being owned, rented or used by the insured and where there might be some advantage to the insured in falsifying or exaggerating a loss." Assumption Parish School Board[ v. Mt. Airy Ins. Co., 1995 WL 626151, *5], 1995 U.S. Dist. LEXIS 15910 at 17.
The Insurers bring to the attention of the court U.S. Fire Ins. V.[v.] Liss, 357 So.2d 1356 (La.App. 4th Cir.1978), where the owner of a building that housed a pizza parlor sued his tenant, the restaurant's operator, after a fire in the pizza oven damaged the building. The restaurant operator third-partied his CGL insurer. The Louisiana Fourth Circuit Court of Appeal held that the policy's rented property exclusion, identical to that contained in the policies at issue herein, defeated coverage.
In conclusion, this court finds that the Owned-Leased Property Exclusion and the Care, Custody and Control Exclusion do not apply in the instant matter. The court believes public policy favors coverage and more importantly protecting the public from further damage arising from the Grefer tract. The public policy of Louisiana regards liability as existing for the protection of the public and secondarily for the prosecution of the insured. La.Rev.Stat. § 22:655; Adams v. Thomas, 98-2003, 98-2005 (La.4/13/99), 729 So.2d 1041, 1043; *774 Davis[Davies] v. Consolidated Underwriters, 199 La. 459, 6 So.2d 351, (La. 1942). In FAV[GAF] Corp. v. Continental Cas. Co., No. 87-3272[, 1989 WL 1761] (E.D.La. Jan. 12, 1989)[17], a landowner was allowed to recover from his CGL liability insurer expenditures which he must make in order to comply with CERLA {sic}.[18]
All of the ITCO companies except one, ITCO Terminal, clearly committed the acts producing damage to the Grefer tract. And as a successor corporation ITCO possesses the obligations and liabilities of its previous corporations. La. Rev.Stat. § 12:115(E). Furthermore, public policy undoubtedly desires that the Grefer tract be remediated to prevent damage to the surrounding area of the Grefer Tract.
Earlier in the same Reasons, the trial court stated that "[i]f the Care, Custody and Control Exclusion was as broad as contended for, it would exclude everything that ITCO did and thus violate the common expectancies of the parties." (Cites omitted.)
The trial court notes the Liss case, but does not state why it would not apply here. The trial court's only reasons for judgment are "public policy" statements. As noted above, public policy does not demand that every insurance policy cover every risk or peril. Insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. Owned-leased property and care, custody, and control exclusions in CGL policies are common and are not against public policy. The trial court itself recognized this in its Reasons for Judgment when it stated: "Louisiana courts have long enforced the owned-leased property exclusions and care, custody and control exclusions in Commercial General Liability Policies ("CGL")." Contrary to the trial court's statements, these policy exclusions would not exclude "everything that ITCO did." This case decides only the specific issue whether coverage is provided for ITCO's actions causing this environmental damage to this particular property that ITCO leased from the plaintiffs.
Like the Liss court, we find that the exclusionary language is unambiguous and means exactly what it says, and is applicable to the case at bar. See also Pro-Boll, supra. Herein, the property damage falls squarely within these exclusions. There is no dispute that the property damage is on property rented or occupied by ITCO, or to property used by ITCO, or to property in the care, custody, and control of ITCO. Furthermore, it is undisputed that the property damage occurred to that particular part of real property on which ITCO was performing its operations and that the property damage clearly arose out of those operations. Reinforcing these undisputed facts is the joint stipulation at the CDC trial that any finding by the jury that ITCO was at fault would constitute a finding that ITCO breached its lease(s).
The trial court's characterization of GAF Corp. v. Continental Cas. Co. is simply incorrect. In that case, Continental moved for Summary Judgment on the issue of pollution coverage under a CGL policy it issued to IWMM, with whom GAF contracted to dispose of toxic wastes GAF had generated. When IWMM illegally disposed of these wastes, GAF was *775 found liable to the State of Louisiana for "damages, clean up costs, etc." GAF sued Continental, as IWMM's insurer, to be reimbursed for IWMM's proportionate contribution to those costs. The trial court denied Continental's Motion for Summary Judgment, disagreeing with Continental's general assertion that "clean up" costs were not "damages" under the policy. Continental further argued the applicability of a pollution exclusion in the policy, but the court noted that neither party had been able to locate the policy in question, and the existence of a pollution exclusion was still contested. The case never mentioned CERCLA (42 U.S.C. § 9601) and did not award the landowner (who was not GAF) clean up costs.
Accordingly, we reverse the trial court's judgment that found these exclusions inapplicable to the case at bar. These exclusions clearly apply to bar coverage under the Gray, TIG Group, and Employers Mutual policies.

Breach of Lease
Gray argues that the trial court erred as a matter of law in declaring that the Gray CGL and Excess policies provided coverage for ITCO's breach of its contract of lease. We find this ruling was not error.
The policy language states that this insurance does not apply to:
"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
(1) assumed in a contract or agreement that is an "insured contract."
"Insured contract" is defined, among other things, as "a lease of premises." Coverage is excluded for this judgment, however, as noted above, under the other policy exclusions.

Employers' Mutual's Assignments of Error
In addition to the above exclusions, Employers Mutual argues that their excess coverage has not been reached. They contend that if the underlying coverage is allocated across the shortest period of coverage, 24 years, the annual losses do not reach the attachment point of any Employers Mutual excess liability policy. Finally, Employers Mutual argues that they are entitled to a credit for the full limits of the settling carriers' policies, and as such, they are not liable for any amount of the CDC judgment.
We find that since the trial court did not issue a money judgment, these issues are not before this court at this time. However, to the extent that the Employers Mutual excess policies are "following form" policies, coverage would be excluded thereunder by the application of the pollution exclusions and the own, rent, occupy and care, custody, and control exclusions as noted above.

The Grefers' Assignments of Error
The Grefers first argue that this appeal is premature, because the trial court did not dispose of all the issues before it in this judgment. They argue that in addition to a declaratory judgment on coverage, they seek execution and a monetary judgment. We disagree that this issue is not ripe for appeal. A decision on the coverage issue may avoid additional litigation that would be necessary to fashion a money judgment against any remaining insurers.
The plaintiffs argue next that the trial court erred in concluding that contamination of the Grefer Tract ended in 1987. They argue that the evidence shows that *776 Exxon continued to ship NORM contaminated pipe to ITCO until 1992.
As noted previously in this opinion, we affirm the trial court's finding that the Grefer tract received no more NORM contaminated pipe after March 27, 1987. Exxon continued to ship used pipe to ITCO after this date, but the evidence showed that contaminated pipe was not placed on the Grefer tract; it was segregated at ITCO's Lower Yard, which was not a part of the Grefer Tract. The trial court's finding that the Grefer Tract received no more radioactive contaminating material after March 27, 1987, is not manifestly erroneous.
Accordingly, the judgment of the trial court against defendants, The Gray Insurance Company, the TIG Group, and Employers Mutual Insurance Company, which found that these insurers provided coverage for the CDC judgment, is reversed.
REVERSED.
NOTES
[1] Grefer v. Alpha Technical, XXXX-XXXX (La. App. 4th Cir.3/31/05), 901 So.2d 1117.
[2] Naturally Occurring Radioactive Material. This material is fully described in Grefer v. Alpha Technical, supra, in the section of the opinion entitled "Background History."
[3] On December 5, 2005, this court learned from the Supreme Court that the plaintiffs have filed a Writ Application to the Supreme Court, 2005-C-1259; as of this date, there has been no action by that Court. It was reported that no other party has applied for writs.
[4] By partial summary judgment granted on August 12, 2003, now final after trial.
[5] The entire transcript of the CDC trial was entered into evidence in this litigation.
[6] Gray argues in its Reply Brief that this policy is not a CGL policy, but the Declarations Page clearly states that the coverage is Commercial General Liability.
[7] Doerr was not an environmental pollution case; it was a personal injury case.
[8] The trial court found that the pipe scale was clearly a pollutant, and this finding is not challenged on appeal by any party.
[9] Defendants also argue that had ITCO knowingly or intentionally discharged this toxic substance, the intentional act exclusion in their polices would have precluded coverage.
[10] See Hazelwood Farm, Inc. v. Liberty Oil and Gas Corporation, et al., 02-266 (La.App. 3 Cir. 4/2/03), 844 So.2d 380, at 384.
[11] See Grefer v. Alpha Technical, 02-1237 (La. App. 4 Cir. 3/31/05), 901 So.2d 1117 at 1124.
[12] See Grefer v. Alpha Technical, 02-1237 (La. App. 4 Cir. 3/31/05), 901 So.2d 1117 at 1122.
[13] Reasons for Judgment, June 14, 2004, p. 9.
[14] For a description of the chemical composition of pipe scale, see the Fourth Circuit's opinion in Grefer v. Alpha Technical, supra, in the section of the opinion entitled "Background History."
[15] The trial court found that ITCO was only negligent in the dispersal of the pipe scale because it did not "know" that the pipe scale contained the radioactive contaminant. This is a misapplication of the third prong.
[16] Record @ 4115.
[17] The trial court miscited this case. The correct title is GAF Corporation v. Continental Cas. Co.
[18] The trial court clearly meant CERCLA.